RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KEVIN EUGENE ASHER,

*Defendant-Appellant*.

⎤
⎟
⎟
⎟
⎬   No. 17-6251
⎟
⎟
⎟
⎦

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:16-cr-00050-1—Karen K. Caldwell, Chief District Judge.

Argued: October 3, 2018

Decided and Filed: December 12, 2018

Before: GILMAN, KETHLEDGE, and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant. Elizabeth Nash, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant. Elizabeth Nash, Thomas E. Chandler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Hydee R. Hawkins, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

JOHN K. BUSH, Circuit Judge. A jailor who abused his power found himself in the defendant's chair. He was indicted for beating up an inmate and filing a false report to cover it

up. The charges required the government to prove that the jailor acted purposefully. So the government notified the jailor that it intended to introduce testimony that the jailor had also battered a different prisoner and concealed that crime. The jailor objected to the introduction of this prior-act evidence. He offered a conditional stipulation: if the jury believed that he committed the charged assault, he would admit intent. And he argued that the prior-act evidence's usefulness for proving his intent was substantially outweighed by the danger that the evidence would unfairly prejudice the jury against him. Over the jailor's objection, the district court admitted the prior-act evidence.

On appeal, Kevin Eugene Asher, the accused jailor, argues that the district court's admission of the evidence was an abuse of discretion. We agree. We therefore vacate Asher's convictions and sentence, and we remand for a new trial.

I.

According to the government, in November 2012, Gary Hill, a recently arrested prisoner, arrived at the Kentucky River Regional Jail and was placed in a detox cell. He asked to make a phone call, but the jailors denied his request. Upset, he turned on the sink in his cell and let the water overflow onto the floor.

Deputy Jailors Asher and Damon Hickman responded. They confronted Hill, but he refused to turn off the water. Annoyed, Hickman punched Hill in the face, knocking him to the floor and severely injuring his jaw. Hickman and Asher then viciously kicked and stomped Hill while he laid curled up in the fetal position on the floor. The assault caused Hill to defecate on himself.

When Hickman and Asher backed off, Hill told them that they would not get away with what happened. But Hill's threat did not intimidate his assailants. The jailors mocked Hill for having soiled his pants and flashed the embroidery emblem on their work shirts in front of Hill's face, stating, "We're the law, dawg. We can do what we want." They told Hill that if he reported the incident, they would lie and claim that Hill assaulted them first.

Unfortunately, Hill's pain and humiliation did not end there. The jailors threw him into a restraint chair and tightened the straps. Then, Asher watched as Hickman pounded Hill's face. The bruises on Hill's wrists memorialized his hopeless attempts to free himself from the restraints. With his arms and legs bound, however, his only defense was to keep his head down. When Hickman finished, the jailors left Hill in the restraint chair: beaten, bruised, and sitting in his own feces. The next memory Hill has is waking up on the cell floor. He was in considerable pain, so he asked to see a doctor. Hickman, however, testified that he and Asher had other plans. They took Hill to another room, where a "doctor" looked at him but gave him no treatment. According to Hickman, the "doctor" was Asher in disguise, donning a jacket, and possibly a hat or a wig, and speaking in a foreign accent. After the fake examination, Hickman and Asher put Hill back into a cell.[1]

Hill later filed a complaint describing the beating. Meanwhile, Hickman and Asher plotted a cover-up. Hickman wrote a false report stating that Hill was the aggressor and that he (Hickman) used necessary force to prevent Hill from harming himself or others. Asher signed Hickman's report and several months later wrote his own corroborating report. In his report, Asher stated that when the jailors entered the cell, Hill cocked his fist back as if to strike the jailors, and Hickman merely de-escalated the situation. As for Hill's injuries, Asher claimed that Hill slipped on the water and hit the wall while trying to evade the jailors. Neither of the jailors' reports mentioned Hill's request to see a doctor.

## II.

The government charged Asher with two felony counts: (i) depriving Hill of his civil rights under color of law, in violation of 18 U.S.C. § 242; and (ii) falsifying a record to impede a federal investigation, in violation of 18 U.S.C. § 1519.[2] Before trial, the government informed

---

[1]The assault caused Hill severe and permanent injury. He suffered severe headaches and bruising and swelling on his face and neck. Hill also has permanent numbness in his jaw.

[2]Hickman pleaded guilty to an assault charge in a different case, and the court sentenced him to 126 months of imprisonment for that crime. *See* Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

Asher that to prove his intent when he assaulted Hill, it planned to introduce evidence of his participation in a similar assault and cover-up involving a different inmate.

That incident occurred about two and a half years before the assault on Hill. Like in the Hill assault, Hickman and Asher entered the detox cell at the Kentucky River Regional Jail, where a recently arrested prisoner, Dustin Turner, was strapped to a restraint chair. Turner taunted the jailors and challenged them to release him from the chair. Hickman obliged and then punched Turner in the face. Turner fell to the ground, and Hickman and Asher hit and kicked him while he was down. The jailors then strapped Turner back into the restraint chair.[3] As a result of the assault, Turner had bruising on his face, neck, and ribs, and had broken teeth.

Hickman and Asher then concocted a plan to conceal their misconduct. They wounded themselves to make it look like Turner had attacked them first. Then they called the police to report Turner's aggression. They also wrote false incident reports. In the reports, Hickman and Asher told a story about their having had to restrain Turner forcibly because of his belligerence.

Asher objected to the government's introduction of this evidence. He cited Federal Rule of Evidence 403 and argued that the danger of the evidence unfairly prejudicing him substantially outweighed its probative value. The district court held a hearing and heard evidence about the prior incident. The court decided that substantial evidence showed that the event had occurred; the government's proposed purpose in introducing the evidence was proper, as Asher had conceded; and the evidence was not unduly prejudicial.

Asher moved to clarify the district court's ruling. Because the government sought to introduce Turner's assault to prove Asher's intent in Hill's assault, Asher asked whether his providing a conditional stipulation on the element of intent could keep the evidence out. Asher explained that his defense was not based on his lack of intent, but that Hickman was lying about Asher's involvement in the assault on Hill. Thus, Asher was willing to stipulate that if the jury

---

[3]This version of events comes from Hickman's trial testimony in Asher's case. The jury also heard a slightly different, but no less reprehensible, version of this assault from the victim. In Turner's version, Hickman and Asher brought Turner into his cell, knocked Turner to the ground, and kicked and punched him. Hickman and Asher then put Turner in a restraint chair and continued to assault him. Turner testified that when he asked to be let up from the restraint chair so that he could defend himself, Hickman and Asher took him out of the chair and slammed him to the ground, rendering him unconscious.

disagreed with him—if it found that he assaulted Hill—then he would concede his having possessed the necessary intent. The government refused to accept this stipulation and argued that it had the right to prove its case—including the element of intent—with the evidence it chose.

On the first day of trial, the district court ruled that the evidence of Turner's assault was admissible. In a written order, the court held that despite Asher's stipulation offer, the prior-act evidence was not unfairly prejudicial under Rule 403. The court explained that the evidence was highly probative of intent because the other assault was "similar in kind and close in time to the charged assault and entry." R. 52, Page ID# 251. The court also concluded that because the prior-act evidence was no more appalling than the charged crime, it was not so shocking that it might "lure the factfinder" into convicting on an improper basis. And this balance would not change, the court held, if Asher stipulated to intent because the government generally has freedom to prove its own case.

At trial, the jury heard evidence about both assaults and cover-ups. The district court orally instructed the jury three separate times that it could consider evidence of the Turner assault only for purposes of proving Asher's intent to commit the charged crimes and for no other purpose. The written instructions given to the jury matched the Sixth Circuit's pattern jury instructions and echoed the judge's warnings about the proper use of the Turner assault evidence. Asher did not object to the jury instructions. The jury found Asher guilty of the charged crimes. The district court sentenced him to 108 months of imprisonment, a sentence at the lower end of his Guidelines range. Asher appealed.

III.

Asher's primary argument on appeal is that the district court should have excluded evidence of the Turner assault and cover-up. He concedes that there was enough evidence for a jury to find that the Turner incident occurred and that the government introduced this evidence for a proper purpose (proving his specific intent in the charged crimes). But, relying on Federal Rule of Evidence 403, he contends that the district court should have kept the prior-act evidence away from the jury because it was unduly prejudicial to him.

Rule 403 provides a balancing test for excluding relevant evidence.  The test is strongly weighted toward admission.  The trial judge may exclude relevant evidence only if "its probative value is substantially outweighed by the danger of unfair prejudice."  *Huddleston v. United States*, 485 U.S. 681, 687 (1988); Fed. R. Evid. 403.  District courts enjoy "broad discretion" in making the prejudice determination.  *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004) (citation omitted).  When the district court admits evidence over a party's undue-prejudice objection, we review the admitted evidence "in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect."  *Id.* (citation omitted).  We will reverse only if the district court abused its discretion.  *United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir.) (citation omitted), *cert. denied*, 137 S. Ct. 2231 (2017).

For prior-act evidence introduced to prove the defendant's intent, probative value depends mainly on two factors:  similarity and temporal proximity.  *See id.* at 447 (citing *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015)).  For similarity, we consider both the intent the defendant formed when he acted as well as the conduct and factual circumstances surrounding that conduct.  *Id.*  Evidence showing that a defendant formed a particular intent on a prior occasion may provide insight into his state of mind when he committed the charged offense.  *See United States v. Hardy*, 643 F.3d 143, 151 (6th Cir. 2011) ("This court has repeatedly recognized that prior drug-distribution evidence is admissible [under Federal Rule of Evidence 404(b)] to show intent to distribute." (citation and internal quotation marks omitted)).  And a prior act has heightened probative value when it shows that the defendant took similar actions in a similar situation.  *See LaVictor*, 848 F.3d at 447 ("LaVictor's previous acts of violence against women are virtually identical to his conduct toward C.B.  Similar to the cases involving the previous women, LaVictor was involved in a lengthy romantic relationship with C.B. that contained similar allegations of abuse triggered by very comparable circumstances.").  That said, the prior act need not be "identical in every detail to the charged offense."  *Id.* (citation and internal quotation marks omitted); *see United States v. Seymour*, 468 F.3d 378, 385 (6th Cir. 2006) (recognizing that testimony of adults who had been sexually assaulted by the defendant "was less probative" in a case involving a defendant's prosecution for molesting a child because the adults were much older than the victim but emphasizing that prior-act evidence still carried substantial probative value because of "marked[] similar[ities]" in the testimonies).

Along with similarity, we consider also temporal proximity. Though this court has never set a time horizon for prior-act evidence,[4] common sense dictates that "temporal remoteness reduces the probative value" of prior conduct. *United States v. Corder*, 724 F. App'x 394, 409 (6th Cir.), *cert. denied*, 138 S. Ct. 2632 (2018) (recognizing diminished probative value of defendant officer's false statements made to investigators sixteen and twenty-three years ago). Conversely, relative temporal proximity increases a prior act's probative value. *See United States v. Stevens*, 303 F.3d 711, 717 (6th Cir. 2002) (emphasizing "the relatively short period of time"—two years—between each fire and the defendant's arson charge).

Courts must also consider the availability of other means of proof. *See Old Chief v. United States*, 519 U.S. 172, 184 (1997) (explaining that the probative-value determination under Rule 403 includes "comparing evidentiary alternatives"); *United States v. Myers*, 123 F.3d 350, 363 (6th Cir. 2007). The Supreme Court has cautioned that the existence of an alternative means of proof—even one with "substantially the same or greater probative value but a lower danger of unfair prejudice"—does not require exclusion of more prejudicial evidence. *Old Chief*, 519 U.S. at 182–83. But we must "discount the value of the item first offered and exclude it if its discounted probative value [is] substantially outweighed by unfairly prejudicial risk." *Id.* at 183; *see United States v. Willoughby*, 742 F.3d 229, 238 (6th Cir. 2014) ("Thus, in light of the other evidence at trial, the probative value of the pimping testimony was modest: it merely showed that Willoughby knew what everyone else knew.").

On the other side of the scale rests unfair prejudice—the "undue tendency to suggest a decision based on improper considerations," like the chance that the jury will convict the defendant because of his prior, instead of his charged, conduct. *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999) (citing *Sutkiewicz v. Monroe Cty. Sheriff*, 110 F.3d 352, 360 (6th Cir. 1997)). One form of unfair prejudice involves the risk that the prior act could cause the jury to reach a verdict based on emotions instead of evidence. *Old Chief*, 519 U.S. at 180. This may occur when, for example, the prior-act evidence so shocks the conscience that the jury may

---

[4]*See United States v. Jones*, 403 F.3d 817, 821 (6th Cir. 2005) (noting that although "prior conduct must be reasonably near in time under the facts of the particular case . . . there is no absolute maximum number of years that may separate a prior act and the offense charged" (quoting *United States v. Ismail*, 756 F.2d 1253, 1260 (6th Cir. 1985) (internal quotation marks omitted))).

decide that the defendant is a bad person and deserves to be convicted, even if his guilt were unproven in the instant case, "because a bad person deserves punishment." *Id.* at 181. Certainly, a jury is more likely to engage in this type of judgment when the prior-conduct evidence portrays the defendant as having committed an appalling act. But when the charged crime has "inflammatory potential" similar to or greater than the prior act, the risk of the jury being inflamed by presentation of the prior-act evidence may be diminished. *United States v. Mandoka*, 869 F.3d 448, 459 (6th Cir. 2017); *see also Stevens*, 303 F.3d at 716–17. If a juror has already heard about the defendant's participation in a terrible charged act, he is less likely to be uncontrollably impassioned when presented with evidence of a similar or less shocking act. Thus, calculating this form of prejudice must involve some comparison between the inflammatory nature of the charged crime to that of the prior act.

Another risk of unfair prejudice, and the one at issue in this case, involves the tendency of the evidence to lure the factfinder into an impermissible propensity line of reasoning— "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." *Old Chief*, 519 U.S. at 180. This risk is heightened when the prior act is much like the charged conduct. As we have said, "[w]hen jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact." *United States v. Jenkins*, 593 F.3d 480, 486 (6th Cir. 2010) (quoting *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994)). So the same factors that make prior-act evidence probative—similarity and temporal proximity—may also increase the risk of this form of unfair prejudice.

Finally, when determining whether evidence is unduly prejudicial, we consider whether a limiting instruction can mitigate the risk of prejudice. *See United States v. Ayoub*, 498 F.3d 532, 548 (6th Cir. 2007). Limiting instructions should identify "the specific factor named in the rule that is relied upon to justify admission of the other acts evidence, explain why the factor is material, and warn the jurors against using the evidence to draw" improper inferences. *United States v. Bell*, 516 F.3d 432, 441 (6th Cir. 2008) (quoting *Johnson*, 27 F.3d at 1194).

But sometimes evidence is so prejudicial that the risk of a jury's improper use of the evidence cannot be quashed by a judge's instructions. In *Jenkins*, the defendant was tried for

drug distribution and gun possession crimes arising out of a search of his residence. 593 F.3d at 480. The principal issue was whether Jenkins (as opposed to someone else) constructively possessed the guns and drugs found in his residence. *Id.* at 483. Over Jenkins's objection, the government offered testimony that eight years prior, he was caught distributing marijuana outside the same residence. *Id.* at 484. The government argued that Jenkins's previous crime tended to show that he knowingly possessed the drugs at the same address with the same intent eight years later. *Id.* at 485. We assumed that Jenkins's prior convictions had some probative value for proving his intent, and we acknowledged that the district court properly instructed the jury about the impermissible use of the evidence. *Id.* at 485–86. Yet we held that the evidence should have been excluded because of its unfair prejudicial effect. *Id.* at 486. We emphasized that the government had other "overwhelming" evidence of intent and the prior act revealed essentially the same crime as the charged conduct. *Id.* Under those facts, we were "firmly convinced that the prejudicial effect of Jenkins's prior conviction substantially outweighed its probative value." *Id.*

Similarly, here, Asher's alleged conduct was at issue, not the intent behind it. The conduct of which Asher was accused provided, in and of itself, a sufficient basis for the jury to find his intent. Asher stood accused of beating a helpless prisoner, and thereby depriving that prisoner of his rights. Asher was further accused of pretending to be a doctor, and falsifying reports to cover up this illegal conduct. It is specious to think that the jury might have disbelieved Asher's denials, yet acquitted him for lack of specific intent. To come to that conclusion, the jury would have had to believe that Asher had beaten a helpless prisoner, pretended to be a doctor, and falsified incident reports *without intending to do so*. The charged conduct itself provided significant alternative methods to prove Asher's intent, to the point that the entire issue of intent was subsumed by the conduct. Thus, the prior-act evidence had only incremental probative value.

Where, as here, the probative value of the evidence is modest due to alternative methods of proof, courts must be especially careful not to allow that evidence to reach the jury if the evidence is unduly prejudicial. In *Jenkins* we rejected the proffered evidence because it was so similar to the conduct being charged as to approach inadmissible propensity evidence: "When

jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact." *Jenkins*, 593 F.3d at 486 (quoting *Johnson*, 27 F.3d at 1193). In the instant case, Asher's alleged crime and the prior-act evidence offered by the government were virtually identical, which the government emphasized in closing arguments. "I'm sure you'll agree that the similarities between the Gary Hill and the Dustin Turner incidents are uncanny. . . . These similarities make it more likely that the defendant acted willfully in this case." R. 111, Page ID# 1316. The prejudice that was introduced not only from the government's evidence, but from the government's presentation of that evidence, is inescapable. Further, here as in *Jenkins*, a curative instruction was insufficient to mitigate that prejudice. As we said in *Jenkins*, "[e]ven when properly instructed to consider the evidence only for some legitimate purpose . . . the danger is obvious that the jury will treat it as propensity evidence instead." *Jenkins*, 593 F.3d at 486. Because the prior-act evidence was only incrementally probative, and the risk of prejudice was high, it was an abuse of discretion for the district court to admit the evidence to the jury.[5]

Finally, we must consider whether the district court's mistake in admitting the evidence was harmless. The admission of inadmissible prior-act evidence is harmless "if the record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error." *United States v. Brown*, 888 F.3d 829, 836–37 (6th Cir. 2018) (quoting *United States v. Clay*, 667 F.3d 689, 700). The government's evidence of guilt in this case was strong, but not overwhelming. Asher's defense at trial was that Hickman was lying about Asher's involvement in the assault on Hill. Absent the prior-act evidence, Asher's attempts to attack Hickman's credibility might have persuaded the jury that Hickman was lying about Asher's role in the assault. And Hill testified at trial that he could not remember much about Asher's role in the beating. Accordingly, as in *Jenkins*, "we cannot say with 'fair assurance' that the admission of [the prior act evidence] did not 'substantially sway' the result at

---

[5]This does not mean that Asher's offer to stipulate to the intent was dispositive. Even in the face of Asher's offer to stipulate, the prosecution was still entitled to present evidence of intent to the extent that the evidence was not unduly prejudicial.

trial." *Jenkins*, 593 F.3d at 486 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Thus, the error was not harmless.[6]

IV.

Asher's convictions and sentence are **VACATED**, and the case is remanded for a new trial.

---

[6]In addition to appealing his conviction, Asher also appealed the validity of his sentence. Because we agree that the district court erred in admitting the evidence concerning Asher's prior acts, and vacate his convictions, we need not determine the validity of the sentence that the district court imposed.