**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0375n.06

Case Nos. 19-5417 & 19-5418

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jun 24, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) | |
| | ) | |
| BETTY TAYLOR; HARRY TAYLOR | ) | **OPINION** |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: NORRIS, DONALD, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Husband and wife, Harry and Betty Taylor, seek resentencing and Harry Taylor seeks reversal of his conviction in this consolidated appeal. A jury convicted both Taylors of conspiracy to commit mail and wire fraud, stealing money from the Social Security Administration (SSA), and falsifying a material fact in relation to the delivery and payment of a health care service. On appeal, Betty argues that the district court improperly applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and improperly denied her a mitigating-role downward adjustment under U.S.S.G. § 3B1.2. Harry argues that the district court should not have allowed evidence about his previously terminated Supplemental Security Income (SSI) benefits under Federal Rule of Evidence 404(b). And he argues that he should have received a downward departure under U.S.S.G. § 5H1.4 for his health concerns. We AFFIRM the

district court's decisions on Betty's claims and Harry's first claim and DISMISS Harry's second claim.

I.

Around 2005 the Taylors and Harry's brother, Gary Taylor, began running a coal brokerage company, Taylors Cobra #1 Coal Company, Inc. (Cobra Coal). The company, at a basic level, bought coal and resold it for a profit. When the Taylors started the company, they listed Betty as the owner. Betty signed away the company to their daughter, at least on paper, in 2008. The government implied that the Taylors did this so they could appear eligible for SSI and Kentucky Medicaid[1] because they would seem to have minimal assets. Harry had been receiving benefits from 2005 to 2006, but the SSA terminated his benefits when it found out his wife had "excess resources" from the company. The evidence at trial revealed that Harry ran much of the day-to-day coal business, and Betty maintained the banking side, even when Harry received benefits. Betty deposited and withdrew money and maintained the checks. An employee with the SSA's Office of the Inspector General testified about a statement that Betty's daughter signed in which she acknowledged that she and Betty did the "bookkeeping." (R. 164, Trial Tr. (Day 3), PID 1509.) So Harry and Betty still had plenty of access to Cobra Coal's resources until the business closed around 2013.

The Taylors were supposed to wait thirty-six months after transferring the assets to their daughter in 2008 before receiving SSI again, but the evidence showed that they waited less than a year before reapplying, sending in multiple applications between 2009 and 2012. The SSA finally awarded them benefits again in 2012, and the benefits they received from 2012 and after were the

---

[1] As noted during trial by an SSA employee located in Kentucky, "[w]ith Kentucky, SSI is an automatic approval for the Medicaid." (R. 163, Trial Tr. (Day 1), PID 1390.) So when the Taylors applied and were approved for SSI, they then started receiving Kentucky Medicaid too.

ones at issue. The jury, by convicting, found that the Taylors made false representations to the SSA about their involvement with Cobra Coal and their access to its assets during and after 2012. This meant the Taylors appeared to qualify for SSI and Kentucky Medicaid benefits, even though they had access to excess resources.

A grand jury in 2016 charged Harry, Betty, and their daughter with conspiracy to commit mail and wire fraud, Harry and Betty with stealing money from the SSA, and Harry and Betty with "falsify[ing] and conceal[ing] a material fact in connection with the delivery and payment" of Kentucky Medicaid. (R. 1, Indictment, PID 1–8.) The government's theory was that the Taylors made a "sham transfer" to their daughter when they realized they could not qualify for SSI benefits with their excess resources from the company. (R. 160, Openings, PID 1006–10.) To the government, the transfer was a sham because the Taylors still ran the business and accessed its funds and assets without any change. Thus, they were ineligible for SSI and Kentucky Medicaid. The defense, in part, argued that the company had no excess resources because the company made no profit. So the Taylors were still eligible for SSI and Kentucky Medicaid.

Before trial, the government notified the defense, as required by Federal Rule of Evidence 404(b)(2), that it intended to introduce "bad acts" evidence against Harry. Specifically it wanted to introduce evidence that the SSA terminated Harry's SSI benefits in 2006 because of Betty's excess resources from Cobra Coal. It also wanted to introduce evidence of correspondence and acknowledgements between Harry and the SSA from 2006 to 2008, including an acknowledgement in 2008 in which Harry agreed that the SSA had overpaid him in 2005 and 2006 when his wife had excess resources from Cobra Coal. The government argued that all this evidence constituted *res gestae* evidence or fell under a Rule 404(b)(2) exception. The Taylors argued in response that the evidence was not so "inextricably intertwined" with the 2012 acts to

3

constitute *res gestae* evidence, and none of the 404(b) exceptions applied. (R. 64, Motion in Limine, PID 202–10.) Before trial, the district court heard argument and ultimately decided that the government could admit the evidence to show knowledge or an absence of mistake. But the district court told the government to not show references to Harry acquiring the 2005 to 2006 benefits fraudulently.

Two specific parts of Harry, Betty, and their daughter's joint trial are relevant here. First, the government presented the evidence of Harry's 2006 termination of benefits, his later correspondence, and his ultimate admission of overpayment and agreement to repay in 2008. The district court gave a limiting instruction to the jurors that they should only use this evidence to assess whether the Taylors may have known about the potential wrongfulness of their actions and what their states of mind may have been. The government also showed that, from 2009 to 2012, the Taylors applied for and were denied benefits several times. In 2012, the SSA finally awarded them benefits again. As mentioned, this payment period from 2012 and on constituted the timeframe at issue.

The second relevant part of trial occurred when the defense called Gary Taylor, Harry's brother, to testify. He ran much of the day-to-day operations of Cobra Coal with Harry. During his testimony, Gary showed and talked about receipts from the company and said the amounts on the receipts accurately reflected Cobra Coal's purchases. But when Harry first handed the receipts over to the initial investigator, they did not list those amounts. On cross-examination, Gary admitted that Harry must have altered some receipts because the copies at trial suddenly included dollar amounts that were not in the originals. Betty's lawyer gave the altered receipts, which were the defense exhibits Gary introduced, to the government during reciprocal discovery, sometime after Harry had given the initial receipts to investigators.

The government then called Leonard Hendrickson to testify. He sold low-quality coal to Cobra Coal. Leonard confirmed that someone altered the receipts that recorded the values of those transactions. He sold coal to Cobra Coal for less than the receipts reflected. So the receipts made it look like Cobra Coal spent more money than it did.

And other evidence supported that someone completely fabricated some receipts from the business. The defense introduced receipts for work done by Junior Crase, a long-haul trucker. The receipts reflected Cobra Coal's payments to Crase, presumably for transporting coal. But the government called Crase's wife and a Bureau of Prisons representative who both testified that those receipts could not be accurate because Junior Crase was in prison during the dates on the receipts.

The jury convicted both Taylors on all counts related to them: (1) conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, (2) stealing money from the SSA in violation of 18 U.S.C. § 641, and (3) falsifying a material fact in relation to the delivery and payment of a health care service (Kentucky Medicaid) in violation of 18 U.S.C. § 1035(a)(1). The jury acquitted the Taylors' daughter on the conspiracy charge—the only charge against her.

At sentencing, the district court found that Harry and Betty obstructed justice by handing the altered receipts over to the government, introducing the receipts into evidence, and/or not objecting to the admission of the receipts. Specifically, Betty's counsel gave receipts to the government, but Betty's counsel claims he had just copied the receipts before sending them the government's way. Betty did not give the receipts to him, he said. Betty also did not introduce the receipts into evidence during trial. Harry's attorney did. But Betty did not object to their introduction. And it was a joint defense. So for both Harry and Betty the district court at sentencing applied a two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1. In

addition, the district court declined to apply a mitigating-role adjustment for Betty under U.S.S.G. § 3B1.2 for her alleged lesser involvement in the scheme and declined to apply medical downward departures for either of them under U.S.S.G. § 5H1.4. The district court ultimately sentenced each Taylor to prison for thirty months. They had to pay over $200,000 in restitution and would have three years of supervised release. Both appealed.

## II.

The Taylors each raise two issues on appeal. Betty argues that (1) the district court improperly applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, and (2) the district court should have applied a mitigating-role downward adjustment under U.S.S.G. § 3B1.2. Harry argues that (1) under Federal Rule of Evidence 404(b), the district court should not have admitted his earlier termination of SSI benefits, his later correspondence, and his admission of overpayment, and (2) he was entitled to a downward departure for his medical issues under U.S.S.G. § 5H1.4. We examine each issue in turn.

## A.

Betty first argues that she should not have received a two-level sentence enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Our case law has shown inconsistencies for what standard of review applies for this guideline. *See United States v. Thomas*, 933 F.3d 605, 608–10 (6th Cir. 2019) (discussing the "mixed messages on the standard of review for this guideline[]"). In *Thomas*, we noted that we review legal interpretations of § 3C1.1 de novo and fact findings related to § 3C1.1 for clear error. *Id.* at 608. But we did not decide what standard to use to "review the *application* of the guideline to the facts—that is, the decision whether the historical facts rise to the level of obstruction under § 3C1.1[.]" *Id.* at 608–10 (emphasis added). On one hand, some of our cases review de novo the application of § 3C1.1 to the facts. *Id.* at 608 (collecting cases).

Others say clear error. *Id.* (same). And others apply both standards, "giv[ing] due deference to the district court's application of the guideline to the facts[.]" *Id.* (quoting *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009)). We left the "resolution of [that] standard of review for another day" because the defendant's challenge failed even under de novo review. *Id.* at 610. Here too, we find that we need not resolve the standard of review, because even under de novo review, Betty's claim fails. *See United States v. Parsons*, 798 F. App'x 922, 927 (6th Cir. 2020) (noting the discrepancy described in *Thomas* and declining to decide the issue because the challenge failed even under de novo review).

The obstructing justice sentencing enhancement applies if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction[.]" U.S.S.G. § 3C1.1. Conduct covered by this guideline includes "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding[.]" *Id.* § 3C1.1 cmt. n.4(C). "[T]he defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." *Id.* § 3C1.1 cmt. n.9.

Here, a de novo interpretation of § 3C1.1 includes producing altered receipts to the government and not objecting to the admission of those receipts by a co-defendant during trial, since § 3C1.1's commentary mentions producing an altered document "during an official investigation or judicial proceeding" as an example. *Id.* § 3C1.1 cmt. n.4(C); *see United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc) (Accompanying commentary helps interpret the guideline unless the commentary is plainly erroneous or inconsistent with the guideline.).

And we do not find that the district court clearly erred in its factual determination that Betty would have known that someone altered these receipts. We have recently said that "in considering whether a defendant had the requisite intent [for the § 3C1.1 enhancement], . . . [a] court may draw all reasonable inferences from the defendant's words and conduct, as well as other relevant circumstances." *United States v. Sosa-Baladron*, 800 F. App'x 313, 329 (6th Cir. 2020). The district court here explained that the trial evidence included testimony that Betty held responsibility for the financial aspects of Cobra Coal. She deposited funds, cashed checks, and withdrew money from the account. And at trial, evidence came in that the Taylors' daughter said she "shared the bookkeeping and check writing with [her] mother, Betty, and [made] deposits and withdrawals." (*See, e.g.*, R. 164, Trial Tr. (Day 3), PID 1509 (another witness reading that statement).) So the district court did not clearly err in finding that Betty acted as Cobra Coal's bookkeeper, seeing and knowing about receipts, even if Betty argues otherwise on appeal. Betty also does not dispute that the receipts remained on the Taylors' property, so that factual finding stands. And Betty does not dispute that her attorney produced those receipts to the government, even though those receipts were allegedly just copies her counsel sent during reciprocal discovery and not ones Betty gave him. There is no clear error over these factual findings that Betty knew about the alterations and intended to keep those alterations quiet.

Now armed with the legal conclusion that altered receipts fit under § 3C1.1 and the factual findings that Betty would have known about these receipts, it is easy to see that Betty's claim still fails, even if we review de novo the application of the guideline to the facts. Betty allowing what she knew constituted altered receipts to go to the government and willingly allowing the

8

introduction of those receipts into evidence at trial obstructed justice such that § 3C1.1 applied.[2]

*See United States v. Leek*, 78 F.3d 585, at *7–8 (6th Cir. 1996) (unpublished table decision) (applying the obstruction of justice enhancement after the defendants produced altered exhibits to the prosecution). She misled the court, the prosecution, and the jury by letting this evidence in and trying to benefit from it.

For these reasons, the district court properly applied the two-level obstruction of justice enhancement.

B.

Betty also argues that the district court committed reversible error by not granting her a three-level mitigating-role adjustment under U.S.S.G. § 3B1.2. We review denials of § 3B1.2 adjustments for clear error. *United States v. Randolph*, 794 F.3d 602, 616 (6th Cir. 2015).

Under § 3B1.2, "[i]f the defendant was a minimal participant in any criminal activity," a four-level reduction is appropriate. U.S.S.G. § 3B1.2(a). "If the defendant was a minor participant in any criminal activity," a two-level reduction applies. *Id.* § 3B1.2(b). And a three-level reduction applies if the defendant falls between a minimal and a minor participant. *Id.* An adjustment is

---

[2] The district court held two sentencing hearings, since counsel did not have the benefit of trial transcripts before the first hearing. During the first hearing, the court commented on why it thought the obstruction of justice enhancement applied. The district judge talked about the tampering of the receipts, which is nothing like what she had seen in eighteen years as a judge. From our reading, she concluded that the receipt tampering was enough to invoke the obstruction of justice enhancement. But she also noted that "[t]here is a question here, and I don't have to make the finding, but of whether both of these, if not one, both of them, did not suborn perjury, which is in and of itself a criminal act." (R. 176, Sent'g Tr., PID 2028.) Presumably she meant urging Gary Taylor to lie on the stand for them. So she seemed to find the receipt evidence sufficient for obstruction of justice, but also noted the seeming suborning of perjury just added to that finding.

But then at the second sentencing, when she ultimately decided to apply the enhancement, the district judge only discussed the tampered receipt evidence in support of her finding. Thus, we only review the obstruction of justice enhancement for the tampered receipts and not any potential requests of Gary Taylor to perjure himself, since that does not appear to be part of the district judge's final decision to apply the enhancement.

appropriate for a minimal participant if she is "plainly among the least culpable of those involved in the conduct of a group." *Id.* § 3B1.2 cmt. n.4. And a minor participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* § 3B1.2 cmt. n.5. Betty argues she falls in between. The proponent of the adjustment must prove a mitigating role by a preponderance of the evidence. *United States v. Roberts*, 223 F.3d 377, 379 (6th Cir. 2000).

When assessing the defendant's participation level, we look to the average co-participant. U.S.S.G. § 3B1.2 cmt. n.3(A). A non-exhaustive list of factors informs a district court about the defendant's participation level:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. n.3(C). "'[A] district court need not tick off sentencing factors to show that it considered them,' but a court cannot, for instance, 'adopt[ ] the government's argument with little elaboration.'" *United States v. Daneshvar*, 925 F.3d 766, 790 (6th Cir. 2019) (second alteration in original) (quoting *United States v. Diaz*, 884 F.3d 911, 914–15, 918 (9th Cir. 2018) (referencing the § 3B1.2 cmt. n.3(C) factors specifically)).[3] Here, the district court did not

---

[3] We note, however, that *Diaz* also said that going forward, a district court would need to explicitly assess the five factors. 884 F.3d at 916 ("Going forward, the assessment of a defendant's eligibility for a minor-role adjustment must include consideration of the factors identified by the Amendment, not merely the benchmarks established by our caselaw that pre-dates Amendment 794's effective date."). But in *Daneshvar*, we did not adopt all of *Diaz*. Rather, we only "adopt[ed] . . . the rationale of the Ninth Circuit, holding that 'a district court need not tick off sentencing factors to show that it considered them,' but a court cannot for instance, 'adopt[ ] the government's argument with little elaboration.'" 925 F.3d at 790 (second alteration in original) (quoting *Diaz*,

explicitly walk through the factors, but it also did not merely adopt the government's argument with little elaboration.

The district court found that Betty contributed to the scheme just as much as Harry. Betty spends much time arguing why she had less of a role in the business than him. But the district court emphasized that Betty "deposited more than a million dollars into the bank account" in three years and "withdrew money from the bank account." (R. 176, Sent'g Tr., PID 2033.) Yet she still said she had no resources when applying for SSI. "[B]y virtue alone of her marching to and from that bank with these checks," she knew she had access to these resources and thus could not receive benefits. (*Id.*) So the district court found that Betty defrauded the SSA of her own accord. She lied just as much as her co-participant, Harry. We see no clear error with this analysis and conclusion. The court found that Betty acted as an average participant, so it did not clearly err in

---

884 F.3d at 914–15, 918). So even though *Diaz* changed the law of the Ninth Circuit going forward, we only follow the narrow point of *Diaz* that *Daneshvar* adopted: a district court need not explicitly walk through the five factors. *See also United States v. Karas*, 793 F. App'x 380, 386 (6th Cir. 2019) (noting that "[t]he district court *may* consider [the] non-exhaustive list of factors" (emphasis added)); *United States v. Bragg*, 762 F. App'x 298, 301–02 (6th Cir. 2019) (finding that the district court's "observations correspond[ed]" with at least two of the factors, which was enough to avoid error, even though the district court did not walk through an explicit factor-by-factor analysis).

Alternatively, some of our cases suggest that the district court needed to assess the factors. *See United States v. Ednie*, 707 F. App'x 366, 371–72 (6th Cir. 2017) (criticizing the district court in part for not walking through the factors from § 3B1.2 cmt. n.3(C)); *United States v. Penny*, 777 F. App'x 142, 151 (6th Cir. 2019) ("This argument would be more convincing had the government been able to point to the court weighing whether [the defendant] was substantially less culpable than the average participant, or the five factors intended to guide the determination."). We have also found the application notes to the guidelines authoritative so long as they are not plainly erroneous or inconsistent with the guideline. *Havis*, 927 F.3d at 386. And "[t]his court gives 'Application Notes to the Sentencing Guidelines . . . controlling weight.'" *Ednie*, 707 F. App'x at 371–72 (ellipsis in original) (quoting *United States v. Hernandez-Fierros*, 453 F.3d 309, 313 (6th Cir. 2006)).

For our purposes, we find that, given the district court's discussion of the issue, it needed not assess the factors explicitly for us to affirm.

denying the mitigating role adjustment. (*See id.* ("[S]he's just a regular participant in the fraud[.]").)

And the district court did not clearly err because many of its findings correspond with the five factors from U.S.S.G. § 3B1.2 cmt. n.3(C). *See United States v. Bragg*, 762 F. App'x 298, 301–02 (6th Cir. 2019) (finding that the district court's "observations correspond[ed]" with at least two of the factors, which was enough to avoid error, even though the district court did not walk through an explicit factor-by-factor analysis). The district court noted that Betty understood the scope and nature of her untruthfulness with the SSA because she saw the account as she deposited and withdrew money. So the first factor favors denying the adjustment because Betty knew how much money she and Harry took home from the business. And as mentioned in the previous section, evidence suggested that she knew they needed to report this income.

The district court also found that Betty actively "applied for Social Security and said she didn't have any resources." (R. 176, Sent'g Tr., PID 2033.) And "[s]he transferred resources to her daughter." (*Id.*) These findings line up with the fourth factor because these were Betty's own, personal acts. And of course the fifth factor strongly weighs against the adjustment. The district court's findings correspond with this factor too because the court noted that Betty had access to income from Cobra Coal but sought to obtain benefits at the same time. Thus, she stood to gain much from the scheme.

So most factors favored denying the adjustment. Yet we note that even fewer than most of the factors weighing toward denial does not require granting the adjustment. *See United States v. Romero*, 704 F. App'x 445, 450 (6th Cir. 2017) (declining to find clear error for not applying U.S.S.G. § 3B1.2, even though most of the non-exhaustive factors favored the defendant). We find that the district court did not clearly err in denying the § 3B1.2 adjustment.

12

C.

Harry also disputes the admission of his 2006 SSI benefits termination because of excess resources and some correspondence and acknowledgements from 2006 to 2008. And he disputes the introduction of his signed statement in 2008 in which he agreed that Social Security overpaid him $8,370.00 between 2005 and 2006 and said he would repay that amount in monthly installments.[4] He argues that Rule 404(b) barred this evidence from coming in because it is bad acts evidence. Rule 404(b)(1) does not allow "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving . . . intent, . . . knowledge, . . . absence of mistake, or lack of accident." *Id.* at 404(b)(2). Any permitted use must be material or at issue in the case to be admissible. *See United States v. LaVictor,* 848 F.3d 428, 445–46 (6th Cir. 2017).

A three-part test informs our review of the district court's decision to admit evidence under Rule 404(b):

> [W]e first review for clear error the district court's factual determination that the "other . . . acts" occurred. Second, we examine de novo the district court's legal determination that the evidence was admissible for a legitimate purpose. Finally, we review for abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect.

---

[4] In his opening brief, Harry argued that the district court should not have allowed his 2006 termination of benefits into evidence. In his reply brief, he then argued that his *2009* termination of benefits should not have come into evidence. We believe Harry meant to say the district court should not have allowed in the *2006* termination and later documents (including the 2008 acknowledgment that he overpaid). We base this determination on the trial transcript citation that Harry provides in the reply brief. (*See* Reply Br. at 1 (citing R. 163, Trial Tr. (Day 1), PID 1433–34 (discussing the 2008 acknowledgment of the 2005 to 2006 overpayment and agreement to repay)).)

*United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000) (alteration in original) (quoting *United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996)).[5] Harry does not dispute the accuracy of the 2006 termination, the evidence of what he and the SSA said between 2006 and 2008, or the 2008 reference to his overpayment. So there is no question over whether these other acts occurred.

We also find that the district court correctly determined "that the evidence was admissible for a legitimate purpose." *Id.* (quoting *Merriweather*, 78 F.3d at 1074). The district court found that the 2006 termination, the 2006 to 2008 correspondence, and the 2008 evidence admitting overpayment and agreement to repay showed knowledge or an absence of mistake under the exceptions for 404(b). (*See* R. 163, Trial Tr. (Day 1), PID 1366 (noting that the evidence sounded like it showed an absence of mistake); *id.* at 1371–72 (concluding that the evidence was admissible to show what the Taylors knew or should have known); *id.* at 1426 (telling the jury to only use the information for knowledge or the Taylors' states of mind).) We agree with the district court. Evidence of a previous time in which the SSA terminated the SSI benefits, plus resulting correspondence, including Harry's agreement that the SSA overpaid him, show that Harry knew he should not receive SSI benefits if he or Betty continued their affiliation with Cobra Coal. And this evidence shows an absence of mistake because the Taylors tried to hide their continued affiliation with Cobra Coal after that point by Betty transferring ownership to her daughter in 2008, even though the Taylors otherwise still maintained their active roles. And whether they knew that

---

[5] We have noted before, however, that there was some discrepancy over this standard of review too. *LaVictor,* 848 F.3d at 444–45. Some cases of ours only used an abuse of discretion standard, instead of this tripartite one. *Id.* (collecting cases). But we later resolved this discrepancy, noting that the standards "are not in fact inconsistent, because it is an abuse of discretion to make errors of law or clear errors of factual determination." *United States v. Mandoka*, 869 F.3d 448, 457 (6th Cir. 2017) (quoting *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008)).

the SSA disallowed their particular participation in the business was material, especially since it related to proving intent.

Third, the district court did not abuse its discretion in finding that the unfairly prejudicial effect of this evidence does not substantially outweigh its probative value. All evidence that makes a defendant look bad is in some sense prejudicial. But that does not make it substantially prejudicial. The evidence had significant probative value because it showed Harry's knowledge and an absence of mistake. And it only provided some unfair prejudice because it showed that Harry had perhaps frauded the SSA before, so jurors may wish to punish him for that instance. But that prejudice is minor, especially given the district court's limiting instruction during trial explaining the proper purpose and urging the jury to ignore any mention of fraud over the pre-2012 evidence. *See LaVictor,* 848 F.3d at 448 (limiting instruction "ameliorated the risk of unfair prejudice"). It is true that a limiting instruction may not always expel the risk of a jury using the evidence improperly. *See United States v. Asher*, 910 F.3d 854, 862 (6th Cir. 2018). An instruction may not suffice if we find the evidence so unduly prejudicial. *Id.* But we do not find the evidence so unduly prejudicial here, so the limiting instruction helps dispel any concerns.

Harry argues that if less prejudicial evidence exists, then a district court should only admit that evidence instead. And this is true, to a degree. We have said: "The Supreme Court has cautioned that the existence of an alternative means of proof—even one with 'substantially the same or greater probative value but a lower danger of unfair prejudice'—does not require exclusion of more prejudicial evidence." *Id.* at 861 (quoting *Old Chief v. United States*, 519 U.S. 172, 182–83 (1997)). "But we must 'discount the value of the item first offered and exclude it if its discounted probative value [is] substantially outweighed by unfairly prejudicial risk.'" *Id.* (alteration in original) (quoting *Old Chief*, 519 U.S. at 183).

Harry points to evidence that the government introduced showing that the Taylors applied for SSI and were denied several times between 2009 and 2012. But no other evidence gave the exact indication of knowledge or absence of mistake that the 2006 to 2008 evidence gave. The 2006 termination, 2006 to 2008 correspondence and acknowledgments, and 2008 admission of overpayment show that Harry had not just been denied, but had his benefits terminated. Actual termination is much more impactful than a mere denial, so it further suggests that Harry would have known and learned that he cannot have access to "excess resources" going forward, based on that experience. And yes, to the Taylors' credit, the information from 2009 to 2012 showed that the SSA told the Taylors they were ineligible to receive benefits. But the 2006 to 2008 evidence, and especially the 2008 admission of overpayment, show Harry's actual acknowledgment that he, in fact, agreed that the SSA overpaid him. Instead of an argument that the Taylors "must have known" about the SSA requirements based on their 2009 to 2012 denials, Harry's acknowledgements show that Harry in fact *undeniably* knew about the SSA requirements. So we decline to find that the other, less prejudicial evidence from 2009 to 2012 mandated excluding the 2006 to 2008 evidence. *See Asher*, 910 F.3d at 861; *Old Chief*, 519 U.S. at 182–83.

So any unfair prejudice did not substantially outweigh the probative value of the evidence. The district court did not abuse its discretion when assessing prejudice. Because we find that the district court adequately admitted the evidence under 404(b)'s exceptions, we need not address whether the *res gestae* exception applied too.

16

D.

Harry suffers from several health issues. Most relevant here, he had methicillin-resistant staph aureus (MRSA), more commonly known as a staph infection. After having it once, he is more susceptible to recurrence. And his MRSA had reoccurred before. So Harry seeks resentencing for a downward departure based on his poor health, especially because he is more susceptible to an infection and thus recurrence in jail. The relevant guideline notes:

> [A] [p]hysical condition . . . may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

U.S.S.G. § 5H1.4.

But "we do not review a district court's decision not to depart downward unless the record shows that the district court was unaware of, or did not understand, its discretion to make such a departure." *United States v. Santillana*, 540 F.3d 428, 431 (6th Cir. 2008). If the district court recognized its discretion, the failure to give a downward departure is unreviewable. *United States v. Church*, 731 F.3d 530, 533–34 (6th Cir. 2013). "We do not require that a district court explicitly state that it is aware of its discretion to make such a departure. Rather, we presume that the district court understood its discretion, absent clear evidence to the contrary." *Santillana*, 540 F.3d at 431 (citations omitted); *see United States v. Theunick,* 651 F.3d 578, 592 (6th Cir. 2011) (finding a departure unreviewable in the U.S.S.G. § 5H1.4 context for these reasons); *United States v. Darji*, 609 F. App'x 320, 330–31 (6th Cir. 2015) (same); *United States v. Hohn*, 443 F. App'x 931, 933 (6th Cir. 2011) (same). If the district court does not appear to have misunderstood its discretion:

> [W]e review the decision of the district court only if "(1) the sentence was imposed in violation of the law; (2) it was imposed as a result of an incorrect application of the guidelines; (3) the sentence represented an upward departure; or (4) the sentence was imposed for 'an offense for which there is no Sentencing Guideline and is plainly unreasonable.'"

*Santillana*, 540 F.3d at 431 (quoting *United States v. Puckett*, 422 F.3d 340, 346 (6th Cir. 2005)); *see also* 18 U.S.C. § 3742(a).

The district court here clearly understood its discretion in deciding whether to grant a downward departure under U.S.S.G. § 5H1.4. The district judge's analysis showed that she weighed the factors for and against granting the departure. Nothing suggested that she thought she did not have discretion to grant a departure. *See Santillana*, 540 F.3d at 431 ("[W]e presume that the district court understood its discretion, absent clear evidence to the contrary.").

And Harry does not argue that any of the other four reviewability factors apply, nor do we find that any apply. So we decline to review the district court's decision to deny the motion for a downward departure.

\*　　\*　　\*

For these reasons, we AFFIRM the district court's decisions related to Betty and related to Harry's evidentiary argument. And we DISMISS Harry's appeal of the denied request for a downward departure under U.S.S.G. § 5H1.4.