RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MICHAEL HARVEL,

*Defendant-Appellant*.

⎫
⎪
⎪
⎬  No. 23-5416
⎪
⎪
⎭

————————

Appeal from the United States District Court for the Middle District of Tennessee at Cookeville.
No. 2:21-cr-00005-1—William Lynn Campbell, Jr., District Judge.

Argued:  March 20, 2024

Decided and Filed:  August 29, 2024

Before:  SUTTON, Chief Judge; SUHRHEINRICH, and MURPHY, Circuit Judges.

————————

## COUNSEL

**ARGUED:**  Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant.  Christopher C. Wang, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant.  Christopher C. Wang, Elizabeth P. Hecker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

————————

## OPINION

————————

MURPHY, Circuit Judge.  Michael Harvel, a county official, sexually assaulted many women that he supervised.  A jury convicted him of infringing the constitutional rights of seven victims in violation of 18 U.S.C. § 242.  On appeal, Harvel raises timeliness, indictment, and evidentiary challenges.  Two of his arguments deserve mention at the outset.  Federal law sets a

five-year statute of limitations for most crimes. *See* 18 U.S.C. § 3282(a). Yet it permits the government to charge crimes "punishable by death" at any time. *See id.* § 3281. Harvel contends that the government did not bring the most serious charges in this case (which involved kidnapping and sexual abuse) within § 3282's five-year statute of limitations. He is mistaken. These counts were not subject to this limitations period because they were "punishable by death" under § 3281. Admittedly, the Supreme Court's Eighth Amendment jurisprudence might bar the death penalty for kidnapping or rape crimes. But we hold that the phrase "punishable by death" in § 3281 looks to the penalty provisions in the charged offense (here, § 242), not to these constitutional standards.

Next, Harvel argues that the government violated the Due Process Clause and Federal Rule of Evidence 403 by introducing "other crimes" evidence (the testimony of five additional women who asserted that Harvel abused them in similar ways) to show his propensity to commit sexual assault. Harvel, however, has not identified a long history of courts uniformly excluding this type of evidence in sex-crime cases—as he must to establish a due-process violation. And the district court reasonably found that the evidence's prejudicial effect did not substantially outweigh its probative value under Rule 403. Because Harvel's other arguments also lack merit, we affirm.

I

For much of his life, Harvel served in various government roles for Cumberland County in eastern Tennessee. He started out in the county's road department helping to repave roads. In 2011, he received a promotion to become the Director of the Solid Waste Department. In the meantime, he entered the political arena, running to become one of eighteen county commissioners. He successfully won several reelection bids.

As the Director of the Solid Waste Department, Harvel ran Cumberland County's recycling center and supervised many workers at this center. Most of the workers performed difficult labor sorting through recyclables running down a conveyor belt. To help with this work, Harvel spearheaded a program in which courts would allow those convicted of minor crimes to pay off their fines by performing community service at the center.

Most of the employees and community-service workers sorting through recyclables at the center were women. Over the years, Harvel sexually assaulted many of these women. The employee who oversaw the community-service workers recalled telling Harvel "[f]ifty or more" times that he "better stop" abusing women or he would "get caught." J.H. Tr., R.149, PageID 1567. Yet many of the women felt like they could not go to the police for two reasons: because of Harvel's status as a high-ranking county official and because of their fear that the police would not believe them due to their criminal records. So Harvel smugly disregarded such concerns. Eventually, a worker did alert law enforcement. In February 2018, the local police launched an investigation into his abuse. The county immediately suspended him.

A couple years later, the FBI opened its own investigation. A federal grand jury indicted Harvel in July 2021. A superseding indictment alleged that he had committed many acts of sexual abuse between 2014 and 2017. It charged him with ten counts of depriving eight women of their constitutional right to bodily integrity in violation of 18 U.S.C. § 242. Some of these counts (most notably, Counts 2 through 5) added that Harvel had committed the violations while engaging in kidnapping or aggravated sexual abuse. Count 6 also charged Harvel with kidnapping, but the district court dismissed this count before trial.

Harvel took his chances before a jury. Each of the eight women (referred to by their initials in this opinion) testified against him. We will summarize their testimony in the order of the counts.

*Count 1: Crime Against J.S.* After committing a joyriding offense, J.S. started performing community service at the recycling center. Harvel later gave her a job there. At that point, he began "fondling," "groping," and "trying to kiss" her every day. J.S. Tr., R.147, PageID 1133. In July 2017, J.S. covered for another employee by spending a day at a satellite recycling center. Harvel showed up when she was working in a shack at this location. He locked the door and tried to rape her. In J.S.'s words: "[H]e picked me up, and he shoved me on the table, and he tried shoving his self on me, had my legs spread like this. He's standing right in the middle with his hands on me, and he's trying to shove my hand in between his pants, and I'm fighting with him." *Id.*, PageID 1160. Harvel stopped the attempted rape after about five minutes when a customer showed up. J.S. suffered bruising on her arms while trying to fight off

his attack.  She eventually quit the job when Harvel threatened to rape her if she failed a drug test.

*Counts 2 and 3: Crimes Against J.C.*  In 2014, a state court ordered J.C. to perform community service at the recycling center for a misdemeanor theft.  On her last day of community service, Harvel also offered her a job.  He asked her to accompany him to his office to fill out paperwork.  While there, he instead grabbed her breasts and forced her to perform oral sex on him for a brief time.  He then told her to come back the next day to start the job.  J.C. arrived late after hesitating about whether to return.  When she did, Harvel took her to his office and again forced her to perform oral sex.  She refused to continue after a short while.  He fired her on the spot.

*Counts 4 and 5: Crimes Against E.D.*  In the summer of 2015, E.D. performed forty hours of community service at the center for a theft she committed while struggling with a drug addiction.  She needed to keep a job as a condition of her probation.  Harvel thus hired her in a different role once she completed her community-service hours.  One evening while they were alone together at the center, Harvel invited E.D. into his office.  He then raped her and threatened that she could lose her job if she told anyone.  E.D. felt like she could not quit at that time because she would have to go back to jail.  A few weeks later, Harvel took E.D. to a remote landfill and raped her a second time in a shed.  E.D. soon chose to quit and return to jail rather than continue to face Harvel.

*Count 7: Crime Against M.M.*  In June 2016, Harvel hired M.M. as an employee.  While she was working on the line, he would often "grab [her] butt and stuff like that."  M.M. Tr., R.148, PageID 1367–68.  After she transitioned to running a forklift, he would routinely put his hands under her clothes, even touching her "private area" on occasion.  *Id.*, PageID 1376–78.  Although M.M. repeatedly told Harvel to stop, he ignored her.  Yet M.M. felt like she could not quit because she was a single mom of three kids and needed the flexibility that the job offered.  She later cooperated in the investigation in February 2018 and quit a few months later.

*Count 8: Crime Against K.J.*  Around November 2017, K.J. also took a job working on the line at the recycling center.  After a couple weeks, Harvel started putting his hands down

K.J.'s pants. On one occasion, he put his hands "[t]o the very top of her private area." K.J. Tr., R.147, PageID 994. He also fondled her breasts and grabbed her butt almost every day despite her repeated objections. She quit after a few months of this abuse.

*Count 9: Crime Against A.O.* Like Harvel's other victims, A.O. began working at the recycling center to complete community-service hours for a theft offense. Harvel quickly hired her as an employee on the sorting line. He then started making inappropriate "sexual comments" to her. A.O. Tr., R.149, PageID 1649. In March 2017, things escalated. Harvel pulled down A.O.'s pants "far enough where [her] whole private area could be exposed" and made an improper remark about her tattoo. *Id.*, PageID 1651–53. A.O. "ran out the door crying" and never returned. *Id.*, PageID 1653. She relapsed on drugs a few weeks later and found herself reincarcerated.

*Count 10: Crime Against C.S.* While C.S. struggled with a drug addiction, a court ordered her to perform community service at the center. After a few earlier assaults, Harvel again accosted C.S. in December 2017. He began to rub C.S.'s vagina through the outside of her pants when she was working on the line. C.S. Tr., R.147, PageID 1087. C.S. immediately "ran out of" the center and (like A.O.) never returned. *Id.* She went on a drug "binge" afterward because she "[d]idn't feel like anything mattered[.]" *Id.*, PageID 1091. She too would have preferred going back to jail than to the center.

*Counts 11: Crime Against J.T.* A court ordered J.T. to perform community service at the center because of a misdemeanor shoplifting offense. Around December 2017, Harvel approached J.T. to offer her a job. According to J.T., he "put his hand on [her] butt" when he did so. J.T. Tr., R.149, PageID 1472.

In addition to the testimony of these witnesses, the government called five other women to the stand. They described uncharged (but similar) sexual misconduct that Harvel had committed against them. Harvel later testified in his defense, denying these many abuse allegations. For the most part, the jury disbelieved him. It returned a guilty verdict on all counts except for Count 11. The district court sentenced him to a total term of 204 months' imprisonment.

Harvel appealed.  He raises timeliness, indictment, and evidentiary challenges to his nine convictions.  We will consider these three groups of challenges in turn.

## II.  Timeliness Challenges

Harvel first argues that the government charged him too late.  He suggests that it did not timely file four specific counts under the governing statute of limitations.  And he suggests that the government did not timely file all the counts under the Due Process Clause.

### A.  Statute-of-Limitations Claim

Harvel asserts that the government did not timely pursue the four violations of § 242 that it charged in Counts 2 through 5 for the assaults of J.C. and E.D.  The timeliness of these counts depends on the statute of limitations that applies to them.  Federal law contains two general criminal statutes of limitation.  It sets a presumptive five-year limitations period for noncapital offenses: "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  18 U.S.C. § 3282(a).  But it excludes capital offenses from this statute of limitations: "An indictment for any offense punishable by death may be found at any time without limitation."  *Id.* § 3281.

All agree that Harvel committed the assaults charged in Counts 2 through 5 in 2014 and 2015—more than five years before the government indicted him in July 2021.  These counts thus would fall outside the five-year statute of limitations for noncapital crimes in § 3282(a).  But all also agree that the government would have timely filed the counts if they qualified as capital offenses that lack a statute of limitations under § 3281.  This case thus boils down to a simple question: Are the four charged violations of § 242 "punishable by death" under § 3281?

Section 242's unambiguous text appears to offer a ready answer: Yes.  This civil-rights statute delineates a staggered sentencing scheme.  It initially sets a maximum penalty of one-year imprisonment for defendants who violate a person's constitutional rights:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person . . . to the deprivation of any rights, privileges, or

immunities secured or protected by the Constitution . . . shall be fined under this title or imprisoned not more than one year, or both[.]

18 U.S.C. § 242.  But it then increases the penalty up to a death sentence if the violation included one of several aggravating circumstances, including kidnapping or aggravated sexual abuse:

[A]nd if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

*Id.*  The four relevant counts alleged that Harvel violated J.C.'s and E.D.'s constitutional rights and that his conduct included at least one aggravating circumstance—either kidnapping, aggravated sexual abuse, or both.  Section 242's plain text thus seems to provide that Harvel "may be sentenced to death" for these offenses because they "include[d] kidnapping" or "aggravated sexual abuse."  *Id.*  For the same reason, they appear to be "punishable by death" under § 3281 and so subject to no statute of limitations.

Yet Harvel says things are not this easy.  Despite § 242's language, he argues that his civil-rights violations were still not "punishable by death."  To support this view, he makes one argument tied to the meaning of that phrase in § 3281.  And he makes a second argument tied to the meaning of the punishment scheme in § 242.  His arguments require us to ask two questions.

*Question 1: Does the phrase "punishable by death" in § 3281 incorporate only statutory law or also constitutional law?*  Harvel contends that an offense should not qualify as "punishable by death" under § 3281 unless all sources of law—including constitutional law—permit the government to impose a death sentence.  He adds that the Eighth Amendment's ban on "cruel and unusual punishments" prohibits the death penalty for nonhomicide offenses like kidnapping and aggravated sexual abuse.  U.S. Const. amend. VIII; *see Miller v. Alabama*, 567 U.S. 460, 475 (2012); *Coker v. Georgia*, 433 U.S. 584, 592 (1977).

We thus must consider what Congress meant by "punishable by death" in § 3281.  The word "punishable" typically means "capable of being punished by law or right."  *Black's Law Dictionary* 1398 (4th ed. 1951); *Ballentine's Law Dictionary* 1052 (2d ed. 1948); *Webster's New International Dictionary* 2013 (2d ed. 1934).  Yet, as the Supreme Court has recognized, this

definition does not help all that much. *United States v. Briggs*, 592 U.S. 69, 72 (2020). It leaves open the critical question: Capable of being punished "under what law?" *Id.* Only the statute that enacted the crime and set its penalty? Or the Constitution too?

Thankfully, the Court in *Briggs* answered this question in a related context. *Briggs* asked whether a rape offense was "punishable by death" under a similar statute-of-limitations provision in the Uniform Code of Military Justice (UCMJ). *See id.* at 71. The government argued that rape offenses were punishable by death (and so subject to no limitations period) because the UCMJ's penalty provisions unambiguously permitted a death sentence. *See id.* at 72. But the defendants responded that their rape charges were not punishable by death (and so untimely) because the Court in *Coker* had held that the Eighth Amendment barred capital punishment for rape—at least in the civilian context. *Id.* at 71–72 (citing *Coker*, 433 U.S. at 592).

For three reasons, the Court sided with the government. *Id.* at 73–78. To begin with, it described the statute-of-limitations provision's "natural referent" as the military code of which it was a part—not other sources of law like state law or constitutional law. *Id.* at 73–74. Next, the Court recognized that Congress seeks to promote clarity with statutes of limitation. *Id.* at 74–77. If Congress had tied the limitations period to Eighth Amendment caselaw, however, the governing period would remain unclear. *Id.* at 74–76. After all, the Court designed its "evolving standards of decency" approach to the Eighth Amendment so that the rules could change over time. *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)); *see Briggs*, 592 U.S. at 76. Lastly, a legislator's policy choice about the proper length of a limitations period depends on factors different from those that bear on whether a penalty violates the Eighth Amendment. *See Briggs*, 592 U.S. at 77–78. For example, when picking a limitations period for rape, legislators might consider that victims often wait to come forward due to the trauma that the crime caused. *See id.* at 77. That fact, by contrast, "plays no part" in an inquiry into whether the Eighth Amendment bars the death penalty. *Id.* at 77–78. Because the Eighth Amendment and the UCMJ's statute-of-limitations provision "served" different "ends," the Court found it unlikely that Congress would connect the limitations period to the Constitution. *Id.*

Each of these reasons shows that "punishable by death" in § 3281 refers to the penalty provisions in § 242—not the Eighth Amendment. *First*, Congress adopted § 3281 in 1948 as part of a comprehensive law that enacted Title 18 of the U.S. Code. *See* Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 827. And just as the UCMJ is commonly known as the military code, Title 18 is commonly known as the "federal criminal code." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005); *Leocal v. Ashcroft*, 543 U.S. 1, 6 (2004); *United States v. Davis*, 588 U.S. 445, 477 (2019) (Kavanaugh, J., dissenting). Given this context, a reasonable reader would view § 3281's "natural referent" as Title 18—not the Constitution. *See Briggs*, 592 U.S. at 73. Indeed, the 1948 law created two default statutes of limitation for federal crimes (either no limitations period or a five-year period) based on their maximum punishment (either a death sentence or something less). *See* 62 Stat. at 827–28. So Title 18's penalty provisions are the "most natural place to look" to decide whether a crime is "punishable by death" under § 3281 or "not" a "capital" offense under § 3282(a). *Briggs*, 592 U.S. at 73; 18 U.S.C. §§ 3281, 3282(a).

*Second*, Congress would have promoted greater clarity by tying the phrase "punishable by death" to § 242's penalty provisions rather than the Eighth Amendment. *See Briggs*, 592 U.S. at 74. If Congress tied the phrase to § 242's penalty provisions, we need only look to § 242's text. It allows Harvel to "be sentenced to death" for his "kidnapping" and "aggravated sexual abuse" crimes. 18 U.S.C. § 242. If it tied the phrase to the Eighth Amendment, the statute of limitations has changed over time. Congress adopted § 3281 a decade before the Supreme Court even created the "evolving standards" approach to the Eighth Amendment. *See Trop*, 356 U.S. at 101 (plurality opinion). At that time, caselaw placed no limits on the crimes that could trigger the death penalty. *See id.* And Harvel's sex-abuse crime would have apparently remained timely until the Court read the Eighth Amendment to bar the death penalty for rape in 1977. *See Coker*, 433 U.S. at 592. But what if the Court—again taking an evolving-standards approach— later permits the death penalty for that offense? *Cf. Kennedy*, 554 U.S. at 455 (Alito, J., dissenting). Would Harvel's crimes become timely again? Alternatively, what if the Court later holds that the Eighth Amendment categorically bars the death penalty? *Cf. Glossip v. Gross*, 576 U.S. 863, 909 (2015) (Breyer, J., dissenting). Would this decision extinguish § 3281 and make every offense (including murder) subject to § 3282(a)'s five-year statute of limitations? It would

be unreasonable to read § 3281 as adopting an elastic statute of limitations that "evolved" along with the Eighth Amendment.

*Third*, just like the UCMJ's statute-of-limitations provision, § 3281 serves different "ends" than the Eighth Amendment. *Briggs*, 592 U.S. at 77–78. For example, Congress may well have declined to adopt a statute of limitations for civil-rights offenses that include "aggravated sexual abuse" because rape victims might hesitate to come forward about the crimes. *See id.* at 77. This case proves that point. Despite Harvel's egregious and extended sexual abuse, it took years for the authorities to charge him because some victims refused to go to the police. As one example, J.C. (the victim in Counts 2 and 3) testified that she did not alert the police after Harvel's sexual abuse because she did not think they would believe her. But again, this concern with ensuring that the government can prosecute criminals "plays no part" in the Court's evolving-standards framework for the appropriate penalties under the Eighth Amendment. *See Briggs*, 592 U.S. at 77–78. In sum, all three of *Briggs*'s rationales compel us to extend its holding to § 3281.

Confirming our conclusion, other circuit courts have unanimously held that a crime is "punishable by death" under § 3281 if the penalty provisions in the statute of conviction permit a death sentence. *See United States v. Murphy*, 100 F.4th 1184, 1205−06 (10th Cir. 2024); *United States v. Payne*, 591 F.3d 46, 56−59 (2d Cir. 2010); *United States v. Ealy*, 363 F.3d 292, 296−97 (4th Cir. 2004); *United States v. Edwards*, 159 F.3d 1117, 1128 (8th Cir. 1998); *United States v. Manning*, 56 F.3d 1188, 1195–96 (9th Cir. 1995). We now join this consensus view.

Harvel's responses lack merit. He first distinguishes *Briggs* on the ground that it arose in the military context. True, the Court explained that its Eighth Amendment caselaw had yet to extend *Coker*'s ban on the death penalty for rape offenses to the military-justice system. *See Briggs*, 592 U.S. at 74–75. And true, *Coker* does apply to Harvel's crimes. But the Court's reading of "punishable by death" in *Briggs* did not turn on the fact that this constitutional question remained open in the military context. It turned on the three factors that we have identified. *See id.* at 73–78. Harvel does not even attempt to ground his reading in any of those factors.

Harvel next says we must "liberally" construe criminal statutes of limitation in favor of defendants. *United States v. Habig*, 390 U.S. 222, 227 (1968) (citation omitted). But this canon represents just one specific application of the general rule of lenity that applies to all criminal laws. That rule kicks in only if we find an ambiguity after exhausting all the usual tools of statutory construction. *See Brown v. United States*, 144 S. Ct. 1195, 1210 (2024). Here, the phrase "punishable by death" in § 3281 has an unambiguous meaning once we consider the relevant statutory context and history. So the liberal-construction canon has no role to play. *See Habig*, 390 U.S. at 224–27; *United States v. Edington*, 992 F.3d 554, 556–57 (6th Cir. 2021).

*Question 2: Does the civil-rights statute permit the death penalty for defendants who commit kidnapping or aggravated sexual abuse?* Even if the phrase "punishable by death" in § 3281 looks only to the penalty provisions in Title 18, Harvel next argues that § 242's penalty provisions permit the death penalty only for offenses that cause death. He is again mistaken.

To begin with, Harvel does not attempt to reconcile his reading with § 242's text. It could not be clearer: if a defendant's actions "include kidnapping" or "aggravated sexual abuse," the defendant "may be sentenced to death." 18 U.S.C. § 242. Although the statute also permits the death penalty "if death results" from a defendant's civil-rights violations, that language merely adds a separate aggravating circumstance that independently authorizes the death penalty—not a necessary precondition for the death penalty in all cases. *Id.* And as the Supreme Court has said time and again, we must enforce unambiguous text as written. *See Dodd v. United States*, 545 U.S. 353, 359 (2005); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).

Harvel nevertheless asks us to rely on factors other than the text. He notes that Congress added § 242's "may be sentenced to death" language in a 1994 crime bill. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 60006, 108 Stat. 1796, 1970−71. By then, the Supreme Court had held that Congress could not impose the death penalty for rape of an adult or kidnapping. *See Kennedy*, 554 U.S. at 420–21 (citing cases). Harvel notes further that the title of the relevant section of the 1994 Act—"Death Penalty for Civil Rights Murders"—suggests that Congress did not mean to extend this penalty to civil-rights kidnappings and rapes too. *See* Pub. L. 103-322, § 60006, 108 Stat. at 1970; *see also Dubin v.*

*United States*, 599 U.S. 110, 120−21 (2023). According to Harvel, this history shows that Congress "could not have intended" for the kidnapping and aggravated-sexual-abuse clauses in § 242 to trigger the death penalty. Appellant's Br. 19. In essence, then, he asks us to view § 242's language as a "scrivener's error" that we may decline to enforce. *Lamie v. U.S. Trustee*, 540 U.S. 526, 539 (2004).

Yet his argument requires us to engage in "quite a lot of speculation" about Congress's motives. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017). And other possibilities readily come to mind as to why Congress might have extended the death-penalty provision to the nonhomicide aggravating factors in § 242. Perhaps some members of Congress wanted to move these crimes outside of § 3282(a)'s five-year statute of limitations. Indeed, Congress had already refused to adopt a statute of limitations for the independent crime of "aggravated sexual abuse." *See* 18 U.S.C. §§ 2241, 3299. Or perhaps some members of Congress wanted to influence the Supreme Court's evolving-standards caselaw—which ties the constitutionality of the death penalty for a crime to the number of jurisdictions that authorize it for that crime. *Cf. Kennedy*, 554 U.S. at 431–33. At day's end, we will not rest our reading on any of this speculation. "If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent." *Lamie*, 540 U.S. at 542. Until it does, we must enforce what the law says, not what the lawmakers meant. *See id.*; *see also Henson*, 582 U.S. at 89–90.

One last point. Although Harvel did not raise the issue, other provisions in Title 18 separately establish preconditions for imposing the death penalty. *See* 18 U.S.C. §§ 3591–92. Apart from certain crimes (such as treason), these laws generally require a defendant to have intentionally or recklessly killed a victim. *See, e.g.*, *id.* § 3591(a)(2). If we read § 242 alongside these other sections, one might have argued that the *entire U.S. Code* shows that kidnapping and aggravated sexual abuse are not "punishable by death." But *Briggs* looked only to the UCMJ's penalties—not other provisions of the UCMJ that might have separately prohibited the death penalty. *See* 592 U.S. at 76–77. Similarly, other courts have held that they need to examine only "the penalties that are set out by statute" for the offense—not whether the specific defendant could get the death penalty on the specific facts. *Payne*, 591 F.3d at 58–59; *see also Murphy*,

100 F.4th at 1205–06; *United States v. Gallaher*, 624 F.3d 934, 940–41 (9th Cir. 2010). Here, too, even if § 3591 would have prevented a court from sentencing Harvel to death, his offense is "punishable by death" under § 3281 because § 242 authorizes that punishment.

## B. Due Process Claim

Harvel alternatively argues that the Due Process Clause should have barred this prosecution because the government took too long to indict him. Local police opened an investigation into his misconduct in February 2018. But the federal government did not indict him until July 2021. In the meantime, two potential witnesses died. So Harvel asked the district court to dismiss the indictment. His motion asserted that the officer who interviewed him at the outset of the investigation had died without preserving exculpatory video evidence. And it asserted that a county employee who would have contradicted a victim's claims had also died. The district court denied Harvel's motion. We review its findings about the historical facts under the deferential clear-error standard but give fresh (de novo) review to its ultimate holding that the government did not violate due process. *See United States v. Lively*, 852 F.3d 549, 566–67 (6th Cir. 2017).

The Fifth Amendment prohibits the federal government from "depriv[ing]" a person of "liberty" "without due process of law[.]" U.S. Const. amend. V. Due to the many other criminal-procedure protections in the Bill of Rights, this due-process right has a narrow role to play in criminal proceedings. *See Medina v. California*, 505 U.S. 437, 443 (1992); *United States v. Lovasco*, 431 U.S. 783, 789–90 (1977). The Sixth Amendment, for example, protects a defendant's right to a "speedy" trial—a right that generally does not get triggered until the government arrests or indicts the defendant. U.S. Const. amend. VI; *see United States v. Marion*, 404 U.S. 307, 313–24 (1971); *United States v. Schaffer*, 586 F.3d 414, 424 (6th Cir. 2009). Yet if we held that defendants had an equally expansive due-process right to a speedy indictment *and* trial, we would upend the "careful balance" that the framers struck. *Medina*, 505 U.S. at 443.

For this reason, the Supreme Court has held that the Due Process Clause in the criminal sphere protects against only those actions that violate "fundamental conceptions of justice" that have historically supported our "civil and political institutions" and fallen within "the

community's sense of fair play and decency[.]" *Lovasco*, 431 U.S. at 790 (citations omitted); *see Medina*, 505 U.S. at 445–46. Applying this standard to timeliness challenges, the Court has added that the government does not violate any "fundamental" notions of fairness if it delays indicting a defendant merely to investigate the crime further. *See Lovasco*, 431 U.S. at 790–96. That is true no matter how unnecessary the additional investigation looks in retrospect. *See id.*

To establish that a delay violates due process, defendants instead must meet what we have called a "nearly insurmountable" burden. *United States v. Rogers*, 118 F.3d 466, 477 n.10 (6th Cir. 1997). We have distilled this burden into two parts. *See Schaffer*, 586 F.3d at 424; *United States v. Duncan*, 763 F.2d 220, 222 (6th Cir. 1985); *United States v. Greene*, 737 F.2d 572, 574 (6th Cir. 1984). A defendant must first prove that the delay caused concrete prejudice to the defense. *See Schaffer*, 586 F.3d at 424–25; *Duncan*, 763 F.2d at 222–23. The defendant must next prove that the government engaged in the delay with the bad-faith motive "to gain a tactical advantage" in the litigation. *Schaffer*, 586 F.3d at 424 (citation omitted); *see United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992).

We need only consider the second element here. *Cf. Greene*, 737 F.2d at 575. Harvel has not established that the delay resulted from anything other than the government's continued investigation. *See Lovasco*, 431 U.S. at 790–96. To begin with, the government's briefing has explained that the delay arose from a combination of its ongoing investigation and the COVID-19 pandemic. *See* Appellee's Br. 48–49. Federal authorities did not open their investigation until April 2020. Mot., R.97, PageID 583. Over the next fifteen months, investigators interviewed "dozens" of witnesses and "reviewed thousands of pages" of potentially relevant documents. *Id.* Although the government did not introduce these allegations in the form of admissible evidence, both the Supreme Court and our court have accepted similar lawyer representations in this context. *See Lovasco*, 431 U.S. at 796; *Rogers*, 118 F.3d at 476–77. That rule makes sense because the defendant bears the burden of proof on this challenge. *See Schaffer*, 586 F.3d at 425–26.

In response, Harvel argues that the government has not offered a "valid reason" why it delayed looking into his crimes from February 2018 (when local authorities started investigating) until April 2020 (when the FBI got involved). *Id.* But our caselaw "neither imputes nor

presumes" the government's bad faith merely because defense counsel cannot "fathom a valid reason for" a part of the delay. *Id.* at 426. Rather, Harvel bore the burden to establish that this part of the delay arose from some illicit attempt to gain a tactical advantage. *See id.* He has not even attempted to show such a motive.

Harvel also suggests that the government had no reason to reinterview witnesses between April 2020 and July 2021 because local authorities had conducted the same interviews back in 2018. But the Supreme Court has rejected the notion that too much investigation can establish a due-process violation. *See Lovasco*, 431 U.S. at 792–93. Besides, the federal authorities were investigating different crimes. Unlike the local police, they had to confirm that Harvel both acted "under color of" state law when he committed his abuse and that this abuse qualified as the violation of "rights" "protected by the Constitution[.]" 18 U.S.C. § 242. The federal reinvestigation thus made good sense. All told, Harvel's speculation that the government may have delayed indicting him for an improper reason falls well short of meeting his burden.

## III. Indictment Challenges

Unable to show that the indictment was untimely, Harvel turns to challenging its contents. He suggests that it did not adequately allege violations of the civil-rights statute and that, at the least, the district court should have granted him a bill of particulars.

*Sufficiency of the Indictment*. Soon after the government indicted him, Harvel moved to dismiss the indictment on the ground that all the § 242 counts failed to plead civil-rights violations. The district court denied this motion. We review its decision de novo. *See United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999).

The Fifth Amendment generally bars the government from initiating a criminal prosecution except "on a presentment or indictment of a Grand Jury[.]" U.S. Const. amend. V. To satisfy this command, an indictment must allege all the elements of the charged crime. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007). It also must include enough facts to alert defendants of the specific offense that the government has charged and allow them to exercise their double-jeopardy rights in future cases. *See Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Landham*, 251 F.3d 1072, 1079–80 (6th Cir. 2001).

Harvel argues that the indictment in his case did not meet these requirements. To allege a violation of the civil-rights statute, the government must prove that defendants acted "under color of" law, that they acted "willfully," and that they deprived their victims of "rights" "protected by the Constitution[.]" 18 U.S.C. § 242; *United States v. Lanier*, 520 U.S. 259, 264 (1997). Harvel focuses exclusively on the under-color-of-law element, suggesting that the indictment failed to allege how he had acted as an agent of the state when committing his abuse.

His claim lacks merit. To begin with, an indictment can satisfy the requirement to allege all elements of the offense merely by reciting the statutory words themselves if those words "fully, directly, and expressly" identify all elements. *Hamling*, 418 U.S. at 117 (citation omitted); *see United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010). Harvel does not cite any authority for the proposition that the under-color-of-law element falls outside this rule. So we can assume that it does not. And each of the charged counts alleged that Harvel engaged in the sexual abuse of his victims "while acting under color of law"—paraphrasing the statutory requirement nearly word for word. *Compare* Indictment, R.46, PageID 330–35, *with* 18 U.S.C. § 242.

In addition, the indictment adequately alleged the "facts and circumstances" to alert Harvel of the specific offenses charged. *United States v. Rankin*, 929 F.3d 399, 405 (6th Cir. 2019) (quoting *Hamling*, 418 U.S. at 117). As a general matter, it identified Harvel as the "Director of the Cumberland County Solid Waste Department." Indictment, R.46, PageID 329. It alleged that, as part of his duties, he "supervised" employees and community-service workers at the recycling center and its satellite locations. *Id.* And it alleged that all eight victims were among the employees and workers that he supervised. *Id.* As a specific matter, the indictment alleged each of the ten civil-rights violations in graphic detail. In Count 2, for example, the indictment alleged that, in September 2014, Harvel took his victim into a locked room at the recycling center, "fondled her breasts, grabbed her head, and forced his penis into her mouth." *Id.*, PageID 330−31. Likewise, in Count 5, the indictment alleged that, in December 2015, Harvel picked up his victim "under the false pretense that he needed help with an official county work project, drove her to an isolated landfill, and, against her will, penetrated her vagina with his penis." *Id.*, PageID 332.

We end with one disclaimer. Some of our cases have suggested that an indictment—like a civil complaint—must allege enough facts to make out "an offense" (and plausibly plead each of the offense's elements). *Landham*, 251 F.3d at 1079 (quoting *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992)). Here, however, Harvel does not cite any cases about § 242's under-color-of-law element—let alone identify the legal requirements for showing that a state official acted "under color of" law. *Cf. United States v. Price*, 383 U.S. 787, 793−95 (1966); *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion); *see also Lindke v. Freed*, 601 U.S. 187, 204 (2024); *Mackey v. Rising*, 106 F.4th 552, 558–61 (6th Cir. 2024). So we need not identify these requirements or determine whether the indictment adequately alleged them. Rather, we need only reject the arguments that Harvel makes: the indictment alleged this under-color-of-law element and identified the specific offenses with which he was charged.

*Bill of Particulars*. Apart from seeking to dismiss the indictment, Harvel also asked the district court to order the government to file a "bill of particulars." The district court denied this request. We review its decision with deference, asking only whether it abused its discretion. *See United States v. Crayton*, 357 F.3d 560, 568 (6th Cir. 2004).

The Federal Rules of Criminal Procedure allow the defendant to "move for a bill of particulars" within a certain period. Fed. R. Crim. P. 7(f). This rule exists to protect defendants from unfair "surprise" about "the nature of the charge against" them and to ensure that they can later assert their double-jeopardy right not to be indicted for the same offense again. *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976). If, however, the indictment already satisfies these goals, the defendant has no need for a bill of particulars. *See id.*; *see also United States v. Salisbury*, 983 F.2d 1369, 1375–76 (6th Cir. 1993); *United States v. Mahar*, 801 F.2d 1477, 1503 (6th Cir. 1986). And the defendant may not use such a bill as a discovery "tool" to obtain evidence outside the normal channels. *Crayton*, 357 F.3d at 568 (quoting *Salisbury*, 983 F.2d at 1375).

Here, the district court reasonably found that the indictment's details eliminated the need for a bill of particulars. *See Birmley*, 529 F.2d at 108. As we have explained, the indictment

specifically identified each of the ten incidents of sexual misconduct. Indeed, even after a lengthy trial, Harvel's briefing fails to identify a single fact from trial that surprised him. *See id.*

## IV. Evidentiary Challenges

Harvel ends with two general evidence-based challenges. He argues that the district court wrongly admitted "other acts" evidence: the testimony of other women who described similar (uncharged) acts of sexual abuse. And he argues that the court wrongly failed to grant a mistrial when one victim testified about inadmissible matters and had an emotional outburst.

## A. "Other Acts" Claim

Before trial, the government notified the district court that it planned to admit evidence that Harvel had sexually assaulted several other women at the recycling center to prove his "propensity to commit sexual assault." Notice, R.96, PageID 553, 568. Experts on the rules of evidence have long noted that this type of "other crimes" evidence typically meets the relevancy test's low bar because the evidence makes it more likely that a defendant committed the specific crime at issue. *See United States v. Potter*, 927 F.3d 446, 452 (6th Cir. 2019); 1 John Henry Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law* §§ 193–94, at 231–33 (1904). Given the risk of prejudice, though, courts have long barred the government from using a defendant's other crimes to show the defendant's "propensity" to engage in the charged crime. *See Michelson v. United States*, 335 U.S. 469, 475–76 (1948); Fed. R. Evid. 404(b)(1).

In 1994, however, Congress carved out an exception to this traditional ban on propensity evidence in Federal Rule of Evidence 413. *See* Pub. L. 103-322, § 320935(a), 108 Stat. at 2135–36. When the government charges a criminal defendant with "sexual assault" (a defined term), Rule 413 generally permits a district court to "admit evidence that the defendant committed any other sexual assault" for "any matter to which it is relevant." Fed. R. Evid. 413(a), (d). This rule allows the government to introduce "other crimes" evidence to show the defendant's propensity to commit sexual assaults—a fact increasing the likelihood that the defendant committed the specific assault at issue. *See United States v. Stout*, 509 F.3d 796, 801–02 (6th Cir. 2007). At the same time, district courts may still exclude evidence of other crimes under Rule 403 "if its

probative value is substantially outweighed by a danger of," among other things, "unfair prejudice" to the defendant. Fed. R. Evid. 403; *see United States v. LaVictor*, 848 F.3d 428, 450 (6th Cir. 2017).

Despite Rule 413, Harvel asked the district court to exclude testimony about his uncharged sexual assaults. He argued that Rule 413 violated the Fifth Amendment's Due Process Clause. And he argued that the risk of unfair prejudice from this testimony substantially outweighed its probative value under Rule 403. The district court disagreed. So five other women who worked at the recycling center testified at trial that Harvel had repeatedly groped them without their consent. On appeal, Harvel renews both challenges to the admission of this testimony.

## 1. Due Process Theory

Harvel first argues that Rule 413 violates the Due Process Clause because it allowed the government to use evidence of his other sexual assaults to establish his propensity to commit the charged assaults. We review this question de novo. *See United States v. Moncivais*, 492 F.3d 652, 658 (6th Cir. 2007); *United States v. Castillo*, 140 F.3d 874, 879 (10th Cir. 1998). And we now join the other courts that have rejected similar due-process challenges to Rule 413. *See United States v. Schaffer*, 851 F.3d 166, 177–81 (2d Cir. 2017); *United States v. Mound*, 149 F.3d 799, 800–01 (8th Cir. 1998); *United States v. Abrams*, 761 F. App'x 670, 675 (9th Cir. 2019) (mem.); *United States v. Enjady*, 134 F.3d 1427, 1430−33 (10th Cir. 1998); *see also United States v. Julian*, 427 F.3d 471, 487 (7th Cir. 2005); *United States v. Stamper*, 106 F. App'x 833, 836 (4th Cir. 2004) (per curiam).

As we have explained, the Supreme Court has read the Due Process Clause to have a "limited operation" in criminal cases to avoid rendering the other procedural protections in the Bill of Rights superfluous. *Dowling v. United States*, 493 U.S. 342, 352 (1990); *see Medina*, 505 U.S. at 443–44. The Fifth and Sixth Amendments give defendants the right "to be confronted with" unfavorable witnesses and not "to be a witness against" themselves. U.S. Const. amends. V–VI. Apart from these evidentiary protections, the Due Process Clause does not also give courts any license to act as "rule-making organ[s] for the promulgation" of evidence rules.

*Spencer v. Texas*, 385 U.S. 554, 564 (1967).　Rather, it generally leaves "the admissibility of evidence" to "state and federal statutes and rules[.]" *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012).

As a result, a prosecutor's admission of evidence will raise a due-process problem only in "rare" circumstances. *Kahler v. Kansas*, 589 U.S. 271, 279 (2020).　Defendants must prove that the admission of the evidence "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina*, 505 U.S. at 446 (citation omitted).　In other words, the admission must conflict with an evidentiary principle "entrenched in the central values of our legal system" as a historical matter. *Kahler*, 589 U.S. at 279; *Montana v. Egelhoff*, 518 U.S. 37, 47−48 (1996) (plurality opinion); *Castillo*, 140 F.3d at 881. This showing typically requires defendants to ground the identified evidentiary principle in "eminent common-law authorities" and "early English and American judicial decisions." *Kahler*, 589 U.S. at 279.

The Supreme Court has consistently rejected challenges to the admission of evidence under this demanding due-process test. *See Stewart v. Winn*, 967 F.3d 534, 538–39 (6th Cir. 2020).　The Court, for example, rejected several challenges to the prosecution's use of a defendant's other crimes to prove such things as the defendant's "intent" or "motive" for the charged crime (a use allowed by Federal Rule of Evidence 404(b)(2)). *See Estelle v. McGuire*, 502 U.S. 62, 74–75 (1991); *Spencer*, 385 U.S. at 560–69; *Lisenba v. California*, 314 U.S. 219, 227–28 (1941).　It has done the same even when an earlier jury had acquitted the defendant of the other crime and when the court of appeals found that the use of this other crime violated Rule 404(b). *See Dowling*, 493 U.S. at 352–54 & n.4.

Harvel's claim fares no better.　To be sure, his case gets off to a better start than these other cases.　The prohibition on using a defendant's other crimes merely to show the defendant's "*propensity* to commit a charged crime" has a lengthy pedigree. *Estelle*, 502 U.S. at 75 n.5 (emphasis added); *see* Thomas J. Reed, *Trial by Propensity: Admission of Other Criminal Acts Evidence in Federal Criminal Trials*, 50 U. Cin. L. Rev. 713, 716–17, 721–22 (1981); Wigmore, *supra*, §§ 193–94, at 231–33; *see also Michelson*, 335 U.S. at 475.　So, while the Supreme Court has never confronted this issue, Harvel can plausibly argue that Rule 413's allowance of

propensity evidence in sexual-assault cases departs from a "fundamental" evidentiary "principle" within the meaning of its cases. *Medina*, 505 U.S. at 446 (citation omitted); *cf. Estelle*, 502 U.S. at 75 n.5. Nevertheless, we conclude that Rule 413 comports with due process for three main reasons.

*Reason One*: The Court has read the Due Process Clause to incorporate the "settled usages and modes of proceeding existing in the common and statute law of England" that early Americans found suitable for "this country." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277 (1856). So the critical inquiry turns on how a reasonable person knowledgeable in the law would have understood the evidentiary rules as they existed in 1791 when the people enacted the Fifth Amendment. *See id.*; *see also Culley v. Marshall*, 601 U.S. 377, 390–91 (2024); *Kahler*, 589 U.S. at 279; *cf. United States v. Rahimi*, 144 S. Ct. 1889, 1924 (2024) (Barrett, J., concurring). Harvel has not met his burden to show a well-settled rule at that time banning the use of a defendant's other crimes for *propensity* purposes. *See Egelhoff*, 518 U.S. at 47–48 (plurality opinion). To the contrary, we find the history "complex—even messy." *Kahler*, 589 U.S. at 287. It leaves us unsure whether this ban predates 1791 or became settled only in later decades.

On the one hand, there is no doubt that pre-1791 authorities began to develop a disdain for the use of a defendant's other (unindicted) crimes in prosecutions. For much of the 1600s, English courts regularly admitted this evidence to show a defendant's bad character. *See* John H. Langbein, *The Origins of Adversary Criminal Trial* 190–95 (2003); Wigmore, *supra*, § 194, at 233 n.1. But both common-law decisions and statutory enactments started to depart from this practice at the end of that century. As a common-law matter, judges began to reject efforts to introduce other crimes, rhetorically asking: "Are you going to arraign his whole life? Away, away, that ought not to be; that is nothing to the matter." *Harrison's Trial*, 12 How. St. Tr. 833, 864 (1692). As a statutory matter, Parliament limited the use of unindicted acts in treason cases to remedy Star Chamber abuses. *See* Treason Act 1695, 7 & 8 Will. 3 c. 3, § 8; Reed, *supra*, 50 U. Cin. L. Rev. at 716–17. In an oft-quoted statement some 70 years later, a treatise suggested that this statute codified a preexisting common-law rule "of rejecting all manner of evidence in

criminal prosecutions that is foreign to the point in issue[.]"  Sir Michael Foster, *Crown Law* 246 (1762).

On the other hand, no caselaw appears to have resolved whether this preexisting common-law prohibition reached the prosecution's use of past crimes for *propensity* purposes until after the founding.  The pre-founding authorities can be read narrowly as recognizing only an unexceptional proposition: that courts should not admit a defendant's other crimes if they are "*irrelevant*" (i.e., foreign) to the charged crime.  Julius Stone, *The Rule of Exclusion of Similar Fact Evidence: England*, 46 Harv. L. Rev. 954, 959 (1933) (emphasis added).  In fact, English courts routinely admitted evidence of these other crimes when they found them relevant in some way.  *See id.* at 960–65; Reed, *supra*, 50 U. Cin. L. Rev. at 718.  Prosecutors, for example, often used evidence of a defendant's prior attempts to pass forged banknotes as proof of the defendant's knowledge that the banknote in question was forged.  *See King v. Whiley*, 168 Eng. Rep. 589, 590 (1804).

How did courts treat a prosecutor's use of other crimes to show a defendant's propensity to commit the charged crime under this framework?  As far as we can tell, it was not until 1810—in an unreported English case called *Rex v. Cole*—that a court held that prosecutors could not use other crimes to show a defendant's "*general disposition* to commit the same kind of offense as that charged against him."  Samuel March Phillipps, *A Treatise on the Law of Evidence* 136 (1st Am. ed. 1816) (emphasis added).  Many authorities thus treat *Cole* (or the Phillipps treatise that discusses it) as the "source" for the modern ban on propensity evidence.  David P. Leonard, *In Defense of the Character Evidence Prohibition*, 73 Ind. L.J. 1161, 1170 (1998); *see, e.g.*, Julius Stone, *The Rule of Exclusion of Similar Fact Evidence: America*, 51 Harv. L. Rev. 988, 1031 (1938); R.A. Fisher, *A Digest of Reported Cases from 1756 to 1870* 576 (1871); *Williams v. State*, 110 So. 2d 654, 659 (Fla. 1959); 1 Francis Wharton, *A Treatise on the Criminal Law of the United States* § 640, at 314–15 & n.l (5th ed. 1861); *State v. Renton*, 15 N.H. 169, 174 (1844).  If accurate, it is hard to describe *Cole*'s holding as one of the "settled usages" that had implicitly made their way into the Due Process Clause some 19 years *before* in 1791.  *Murray's Lessee*, 59 U.S. at 277.

*Reason Two:* If we turn to a review of American practice, Harvel again fails to establish any "uniform and continuing acceptance" of the rule against propensity evidence in the sex-crime cases covered by Rule 413.  *Egelhoff*, 518 U.S. at 48 (plurality opinion).  Courts and commentators have long bemoaned the "considerable confusion" that has existed in this country about when prosecutors may admit a defendant's other crimes at a criminal trial.  *Williams*, 110 So. 2d at 658; *see* Stone, *supra*, 51 Harv. L. Rev. at 988.  Some courts seemed to adopt a general ban on the use of "other crimes" evidence along with several exceptions to this ban.  *See, e.g.*, *People v. Molineux*, 61 N.E. 286, 293–94 (N.Y. 1901).  Other courts seemed to follow the English framework by asking only whether a defendant's other crimes were relevant to the charged crime.  *See, e.g.*, *State v. Lapage*, 57 N.H. 245, 289–95 (1876); *see also* Reed, *supra*, 50 U. Cin. L. Rev. at 728–30; Stone, *supra*, 51 Harv. L. Rev. at 989–1004.  Either way, though, American courts generally followed *Cole* by treating other-crimes evidence as inadmissible when used *only* to prove a defendant's disposition to commit the charged crime.  Wigmore, *supra*, § 194, at 236; *see, e.g.*, *Lapage*, 57 N.H. at 289; *Walker v. Commonwealth*, 28 Va. 574, 575–76 (1829).  Critically, however, many jurisdictions soon developed a "lustful disposition" exception that allowed prosecutors to introduce a defendant's other criminal acts in sex-offense cases.  *See Schaffer*, 851 F.3d at 179; *Castillo*, 140 F.3d at 881; *see generally* Thomas J. Reed, *Reading Gaol Revisited: Admission of Uncharged Misconduct Evidence in Sex Offender Cases*, 21 Am. J. Crim. L. 127, 168−80 (1993).

The nearly 200-year debate over this exception's scope further undermines any claim that Rule 413 violates a uniform (and uniformly unbending) practice.  *Cf. Kahler*, 589 U.S. at 292–95.  In the early decades, courts debated whether prosecutors could introduce evidence of other sexual acts between the *same parties* to prove that the defendant committed the charged act.  *Compare People v. Jenness*, 5 Mich. 305, 320 (1858), *and Williams v. State*, 27 Tenn. 585, 593–95 (1848), *and State v. Wallace*, 9 N.H. 515, 517 (1838), *and Commonwealth v. Merriam*, 31 Mass. 518, 520–21 (1833), *with State v. Bates*, 10 Conn. 372, 373−74 (1834).  Eventually, the "great weight of authority" allowed this evidence.  *State v. Ferrand*, 27 So. 2d 174, 176 (La. 1946); *see State v. Markins*, 95 Ind. 464, 466 (1884).  The debate then turned to whether the prosecution in, say, a rape case could introduce evidence of the defendant's prior sex crimes against *other victims*.  While many courts initially stuck to the narrower rule and prohibited

admission of this evidence, a "substantial line of cases" soon adopted this broader view of the lustful-disposition exception.  Stone, *supra*, 51 Harv. L. Rev. at 1031−32; *compare State v. Pace*, 212 P.2d 755, 759−60 (Or. 1949) (en banc); *People v. Gray*, 96 N.E. 268, 272 (Ill. 1911), *with Taylor v. State*, 97 P.2d 543, 544−47 (Ariz. 1940); *State v. Jenks*, 268 P. 850, 851 (Kan. 1928). By the time Congress adopted Rule 413 in 1994, "[j]uries in courts across the country" routinely considered "the criminal history of sex offenders[.]"  Reed, *supra*, 21 Am. J. Crim. L. at 217.

All told, the general rule barring the use of "other crimes" evidence to prove a defendant's propensity to commit the charged crime does not appear to have become settled until sometime in the 1800s.  And the specific lustful-disposition exception to this general rule took root not much later.  This history is not the stuff of a practice "so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Medina*, 505 U.S. at 446 (citation omitted).

*Reason Three*: The Supreme Court has not read the Due Process Clause as imposing a straitjacket on legislators or rulemakers requiring them to mimic the *precise version* of a legal practice that "has been immemorially the actual law of the land[.]"  *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 619 (1990) (plurality opinion) (quoting *Hurtado v. California*, 110 U.S. 516, 528–29 (1884)).  Rather, it has allowed these policymakers to change course so long as the new methods adhered to the "*traditional notions* of fair play" that undergirded the old ones.  *Id.* at 622 (emphasis added) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

In this respect, the Federal Rules of Evidence continue to contain the two basic protections traditionally served by the ban on propensity evidence.  To begin with, that ban has always existed to protect against the "unfair surprise" that can arise from attempts to accuse a defendant of uncharged crimes without adequate notice.  *Michelson*, 335 U.S. at 476; *see also* Wigmore, *supra*, § 194, at 233; *Walker*, 28 Va. at 576; Foster, *supra*, at 246.  But the rules largely eliminate this notice concern.  Rule 413 requires prosecutors to alert defendants before trial of the intent to introduce uncharged sexual assaults and the "expected testimony" about those crimes.  Fed. R. Evid. 413(b).  Next, the ban on propensity evidence exists to protect against the "unfair prejudice" that can arise if the jury learns of the defendant's other misconduct.  *Michelson*, 335 U.S. at 476; *see Walker*, 28 Va. at 576.  But the rules account for

this concern too.  Courts may exclude evidence otherwise admissible under Rule 413 if the risk of "unfair prejudice" to the defendant substantially outweighs its "probative value" under Rule 403.  *LaVictor*, 848 F.3d at 450.

As other courts have recognized, these continued protections undercut any due-process challenge to Rule 413.  *See Schaffer*, 851 F.3d at 180; *Enjady*, 134 F.3d at 1433.  The modern rules respect the same fairness concerns that undergirded the traditional ban on propensity evidence, but they do so through a different procedural route: a *case-by-case standard* rather than an *across-the-board rule*.  Traditionally, the rule categorically barred this propensity evidence without regard to its probative value or prejudicial effect in an individual case.  Nowadays, courts must balance these factors to decide whether to admit the evidence in each case.  Especially given its "limited operation" in this criminal sphere, we see no basis for concluding that the Due Process Clause constitutionalized one or the other of these administrative approaches.  *Dowling*, 493 U.S. at 352.

## 2.  Rule 403 Theory

At the least, Harvel next argues, the district court wrongly refused to exclude the evidence of his uncharged sexual assault as unduly prejudicial under Rule 403.  That rule provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"  Fed. R. Evid. 403. We review the district court's Rule 403 balancing for an abuse of discretion.  *See United States v. Sykes*, 65 F.4th 867, 879–80 (6th Cir. 2023); *United States v. Libbey-Tipton*, 948 F.3d 694, 701 (6th Cir. 2020).  This deferential review requires us to assume that the evidence had its "maximum" possible probative value and "minimal" possible prejudicial effect.  *United States v. Seymour*, 468 F.3d 378, 386 (6th Cir. 2006) (citation omitted).

The district court's ruling fell well within its discretion under this nondemanding test.  For starters, the evidence had substantial "probative value" under Rule 403.  Our cases recognize that the value of uncharged sexual assaults can often turn on how closely those assaults resemble the charged offenses.  *See Sykes*, 65 F.4th at 880; *see also United States v. Hruby*, 19 F.4th 963, 969 (6th Cir. 2021); *United States v. Underwood*, 859 F.3d 386, 393 (6th Cir. 2017); *Seymour*,

468 F.3d at 386. The government's evidence in this case is valuable under that test. Five other women testified about Harvel's abuse. The abuse involved similar victims (women that Harvel supervised) at the same location (the recycling center) around the same time (between 2014 and 2017). It also involved a similar mode of operation: Harvel repeatedly groped the women, sometimes under their clothes. They also told him to stop—to no avail. This evidence may well have been admissible even apart from Rule 413 to show his general "plan" or the "absence of mistake." Fed. R. Evid. 404(b)(2); *cf. Williams*, 110 So. 2d at 663. After all, Harvel defended against one of the victim's claims on the ground that he had "accidentally tripped and fell into her[.]" Harvel Tr., R.152, PageID 2229. And he defended against another victim's claims on the ground that they often "horseplayed around" in a harmless way. Harvel Tr., R.151, PageID 2097.

Nor has Harvel identified any risk of "*unfair* prejudice." *Libbey-Tipton*, 948 F.3d at 704. Testimony is not "prejudicial" under Rule 403 simply because it provides powerful evidence that the defendant committed the charged crimes. *Id.* Rather, the defendant must show that the evidence might lead the jury to convict for an *inappropriate* reason. *See id.* This type of prejudice might exist if, for example, the evidence could lead the jury to give "excessive weight to the vicious record of crime" and convict the defendant "irrespective of guilt of the present charge." Wigmore, *supra*, § 194, at 233. But Harvel identifies nothing of the sort here. The charged crimes (in particular, the rapes or attempted rapes alleged in Counts 1 through 5) were much more "inflammatory" than the uncharged conduct. *Libbey-Tipton*, 948 F.3d at 704. The uncharged allegations also did not change "the tone and tenor of the trial." *United States v. Mandoka*, 869 F.3d 448, 456 (6th Cir. 2017). And the district court issued limiting instructions to further reduce any prejudice by making clear that Harvel was not on trial for the uncharged conduct. *See Sykes*, 65 F.4th at 880.

Harvel responds with a citation to *United States v. Asher*, 910 F.3d 854 (6th Cir. 2018). There, the government indicted a deputy jailor for committing excessive force. It sought to establish the jailor's intent by introducing his alleged abuse of another detainee years earlier. *See id.* at 858–60. We held that the district court abused its discretion in admitting testimony about this other incident under Rule 404(b). *See id.* at 860–64. We reasoned that the evidence had

little probative value because the dispute boiled down to whether the jailor had—in fact—beaten up the victim (not on his intent in doing so). *See id.* at 863. We added that evidence of the earlier beating likely led the jury to engage in improper "propensity" reasoning. *See id.* at 863–64. This case is nothing like *Asher*. The government introduced the evidence of Harvel's other assaults under Rule 413—not under Rule 404(b)—so the jury could engage in the "propensity" reasoning that *Asher* found forbidden. And unlike the defendant in *Asher*, Harvel did raise an "intent" defense by suggesting, among other things, that he simply made accidental contact with a victim.

## B. Mistrial Claim

Harvel lastly argues that the district court wrongly denied his motion for a mistrial after J.S. (the victim connected to Count 1) testified about inadmissible matters and ridiculed Harvel or his counsel. He is wrong for a final time.

1. We start with the background. Before trial, Harvel moved to bar J.S. from testifying about a prior sexual assault that she had suffered as a child. Harvel worried that this assault might come up at trial because J.S. recalled telling him about it when trying to get him to stop his abuse. The court resolved Harvel's motion with a compromise ruling. It would allow J.S. to testify about the past abuse generally. For example, J.S. could testify that she told Harvel: "Don't do this" because "I've experienced something like this before[.]" Tr., R.146, PageID 919. But it refused to allow J.S. to get into any "specificity" about the past abuse, including that it occurred in her childhood. *Id.*, PageID 919–22.

On the first day of J.S.'s testimony, she stated that Harvel repeatedly and forcibly groped her. The prosecutor then asked: "At some point did you say something to him about what had happened to you before to try to get him to stop?" J.S. Tr., R.147, PageID 1136. J.S. replied: "I did. I'm not gonna lie. You know, Mike, you would have been a good boss, but you—you abused your power. I hate—I tried talking to him because I went through problems as a child, and I felt[.]" *Id.* Harvel's counsel immediately objected to the "child" reference. *Id.* The prosecutor told J.S. not to "go into any detail" but asked if she had told Harvel "that something had happened before?" *Id.* She answered in the affirmative. *Id.*, PageID 1137. The prosecutor

followed up by telling her to describe what she had told "him had happened before, just generally speaking[.]" *Id.* She replied: "That I went through issues as a child, and I'd be damned if I'm going to go through this as an adult." *Id.* Harvel again objected. *Id.* At a bench conference, the prosecutor apologized and noted that he had "instructed her specifically not to say that." *Id.*, PageID 1138. Harvel's counsel moved for a mistrial. *Id.* The district court denied the motion. But it gave a limiting instruction to the jury.

The next day, Harvel's counsel cross-examined J.S. Well into this cross-examination, Harvel's counsel asked: "You were never raped in this case, were you?" J.S. Tr., R.148, PageID 1214. J.S. replied: "No, I wasn't, but I was threatened. And I went through it as a child, and I also told him that I would not go through it as an adult." *Id.* As defense counsel objected to this statement, J.S. said: "Don't even. Don't even." *Id.* The court then ordered the jurors to leave the courtroom. While they departed, J.S. shouted "[y]ou're disgusting" at Harvel or his attorney. *Id.*, PageID 1215. Harvel's counsel renewed his motion for a mistrial. The court denied the motion but gave another limiting instruction.

2. We review the district court's denial of Harvel's motion for a mistrial for an abuse of discretion. *See United States v. You*, 74 F.4th 378, 389 (6th Cir. 2023); *United States v. Atisha*, 804 F.2d 920, 926 (6th Cir. 1986). Even assuming that the Federal Rules of Evidence prohibited J.S. from testifying in detail about the prior assault, Harvel has shown no such abuse. *Cf. United States v. Howard*, 621 F.3d 433, 458–59 (6th Cir. 2010). Generally, a district court can fix an evidentiary error by striking the inadmissible statement and giving a limiting instruction to the jury. *See United States v. Brown*, 677 F. App'x 247, 251 (6th Cir. 2017); *United States v. Greene*, 400 F.2d 847, 848 (6th Cir. 1968) (per curiam). To establish a right to a mistrial, then, a defendant must show that the claimed error caused such "serious" or "incurable" "prejudice" to the defense that nothing but a new trial before a new jury could remedy it. *Atisha*, 804 F.2d at 926; *United States v. Ledbetter*, 929 F.3d 338, 362 (6th Cir. 2019). That is, a district court must treat "fairness to the accused" as the inquiry's North Star. *Atisha*, 804 F.2d at 926; *see United States v. Massengill*, 769 F. App'x 342, 347 (6th Cir. 2019); *United States v. Forrest*, 17 F.3d 916, 919 (6th Cir. 1994) (per curiam).

Beginning with our 1994 decision in *Forrest*, though, our caselaw has separately identified five questions to consider when deciding whether improper testimony warrants a mistrial. 17 F.3d at 920 (citing *United States v. Hernandez*, 873 F.2d 925, 928 (6th Cir. 1989)); *see, e.g.*, *Ledbetter*, 929 F.3d at 362; *Massengill*, 769 F. App'x at 347; *Howard*, 621 F.3d at 459. First, did the prosecutor intentionally solicit the inadmissible evidence? *See Ledbetter*, 929 F.3d at 362. Second, did the prosecutor engage in an unreasonable line of questioning? *See id.* Third, did the district court immediately issue a clear and forceful limiting instruction? *See id.* Fourth, did the prosecution act with bad faith? *See id.* And fifth, did the challenged testimony make up a large or small part of the case against the defendant? *See id.* Note that three of these questions look more to the intent of the prosecutor than to the harm to the defendant. So perhaps our general "fairness to the accused" barometer adds the prosecutor's *culpability* into the mix and does not examine *prejudice* to the defense alone. *Atisha*, 804 F.2d at 926; *cf. Hernandez*, 873 F.2d at 928.

Regardless, we need not reconcile this caselaw here. Even when considering J.S.'s challenged statements collectively, the district court reasonably held that they did not warrant a mistrial. That conclusion remains the same whether we look at this question from the perspective of *deterring* prosecutorial misconduct or from the perspective of *curing* prejudice to the defense.

Starting with the deterrence rationale, we see no misconduct to punish. The district court found that the prosecutor had not "solicited" the comment about J.S.'s childhood or acted in "bad faith[.]" J.S. Tr., R.147, PageID 1143−44; *see Ledbetter*, 929 F.3d at 362. Plenty of evidence supported that finding. Before J.S.'s testimony, the prosecutor had "instructed [J.S.] specifically not to" mention that the abuse occurred in her childhood. J.S. Tr., R.147, PageID 1137−38. During her testimony, the prosecutor asked J.S. not to "go into any detail" about the prior abuse. *Id.*, PageID 1136; *cf. United States v. Mellies*, 329 F. App'x 592, 603 (6th Cir. 2009). And after her testimony, the prosecutor repeatedly "apologize[d]" to the court for J.S.'s failure to heed his instructions. J.S. Tr., R.147, PageID 1138. Lastly, the prosecutor did not solicit J.S.'s later comment on the second day ("you're disgusting") because it occurred during the defense counsel's cross-examination. *Cf. United States v. Adams*, 655 F. App'x 312, 320 (6th Cir. 2016)

(per curiam).  Nor did the prosecutor engage in any "unreasonable" line of questioning.  J.S. Tr., R.147, PageID 1143; *see Ledbetter*, 929 F.3d at 362.  To the contrary, the prosecutor followed the clear line that the district court had set before trial.  He sought to "generally" discuss what J.S. had told Harvel about her past abuse without getting into specifics.  Tr., R.146, PageID 919.

Turning to the prejudice rationale, we see no "incurable" harm to Harvel's case from J.S.'s statements.  *Ledbetter*, 929 F.3d at 362.  Both on direct and on cross-examination, J.S. made what are best described as "stray" (if inflammatory) remarks.  J.S. Tr., R.147, PageID 1144; *see* J.S. Tr., R.148, PageID 1219; *cf. Mellies*, 329 F. App'x at 603.  And those remarks represented "a small part" of J.S.'s testimony—not to mention the government's entire case. *Ledbetter*, 929 F.3d at 362 (citation omitted); *see United States v. Woods*, 14 F.4th 544, 559 (6th Cir. 2021).  Over many days of trial, the government presented "extensive" testimony detailing Harvel's guilt from thirteen separate women—all of whom told similar stories about his sexual abuse at the recycling center.  *Massengill*, 769 F. App'x at 347; *see Ledbetter*, 929 F.3d at 362–63.

In addition, the district court gave "immediate, clear, and forceful" limiting instructions to the jury.  *Ledbetter*, 929 F.3d at 362 (citation omitted).  On the first day, it told the jury to "disregard" J.S.'s "testimony" about "things that she claimed had happened before in her life," to "not consider [this testimony] for any purpose," and to "treat it as if you never heard it."  J.S. Tr., R.147, PageID 1145; *cf. United States v. Hayes*, 399 F. App'x 57, 60 (6th Cir. 2010).  On the second day, the court told the jury that it could consider only "testimony" from the witness stand and no other "statements" that the jury might have overheard.  J.S., Tr., R.148, PageID 1223.  It also explained again that the jury must disregard J.S.'s testimony about what had "happened years ago" and that the jurors cannot consider it "when you are deliberating in this case."  *Id.*, PageID 1224; *cf. Hayes*, 399 F. App'x at 60.  All told, the district court reasonably found that this case falls within our general rule: the court adequately cured the claimed errors by striking the improper evidence and issuing a limiting instruction.  *See Brown*, 677 F. App'x at 251.

We affirm.